IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2014 Term

**FILED**

**February 5, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 13-0342

IN RE:  B.H. and S.S.

Appeal from the Circuit Court of Wood County
Honorable John D. Beane, Judge
Civil Action Nos. 11-JA-145 and 11-JA-146

AFFIRMED

Submitted:  January 15, 2014
Filed:  February 5, 2014

Reggie R. Bailey, Esq.
Parkersburg, West Virginia
Attorney for Petitioner Krista H.


Michael D. Farnsworth, Jr., Esq.
Parkersburg, West Virginia
Guardian *Ad Litem* for B.H. and S.S.

Patrick Morrisey, Esq.
Attorney General
Charleston, West Virginia
Lee A. Niezgoda, Esq.
Assistant Attorney General
White Hall, West Virginia
Attorneys for Respondent
West Virginia Department of
Health and Human Resources


JUSTICE LOUGHRY delivered the opinion of the Court.

**SYLLABUS BY THE COURT**

1. "'Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.' Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996)." Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

2. "'[C]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened . . . .' Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syl. Pt. 4, in part, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

i

3. "At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child." Syl. Pt. 6, *In Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991).

4. In making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child.

5. "'To justify a change of child custody, in addition to a change in circumstances of the parties, it must be shown that such change would materially promote the welfare of the child.' Syl. Pt. 2, *Cloud v. Cloud*, 161 W.Va. 45, 239 S.E.2d 669 (1977)." Syl. Pt. 5, *In re Frances J.A.S.*, 213 W.Va. 636, 584 S.E.2d 492 (2003).

LOUGHRY, Justice:

The petitioner, Krista H. ("the mother"), appeals from the January 9, 2014, Corrected Disposition Order through which the Circuit Court of Wood County granted primary custodial responsibility of her daughters, B.H. and S.S.,[1] to their biological father, the respondent Randy H., Jr. ("the father");[2] granted her unsupervised visitation with the children; and dismissed the proceeding from the circuit court's docket.[3] Seeking a reversal of the circuit court's order and the entry of a new order making her the primary custodial parent, the mother asserts that the circuit court erred by granting the father primary custody of the children because she had substantially complied with the terms and conditions of her

---

[1]Consistent with our practice in cases involving sensitive matters, we use the first name and last initial of the parents and the child victim's initials. *See State v. Edward Charles L.*, 183 W .Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990); *see also* W.Va. R. App. P. 40(e)(1).

[2]The record reflects that the Randy H. is the biological father of both S.S. and B.H. There is some indication in the appendix record that the mother and father were married and later divorced, although the Court could not find a specific date in the record for either event.

[3]On April 5, 2013, the mother filed her notice of appeal from the circuit court's first Disposition Order entered March 6, 2013, that terminated her custodial rights to B.H. and S.S. and gave primary custody of the children to their father. This order also gave the mother liberal visitation with her daughters pursuant to the Multi-Disciplinary Team's proposed Parenting Plan, which the circuit court adopted. Under Rule 50 of the Rules of Procedure for Child Abuse and Neglect Proceedings, "[t]he filing of a petition for appeal does not operate to automatically stay the proceedings or orders of the circuit court in abuse, neglect, and/or termination of parental rights cases . . . ." The circuit court's docket sheet reflects that no stay was entered in this matter and, during the pendency of this appeal, the circuit court entered its Corrected Disposition Order.

1

improvement period and by denying her an adequate opportunity to regain primary physical

custody of the children through unsupervised visitation. Based upon the record, the parties'

briefs, and the arguments presented, we find no error. Accordingly, we affirm the circuit

court's award of primary custody of the children to the father and unsupervised visitation to

the mother.

## I. Factual and Procedural Background

On December 5, 2011, the respondent, the West Virginia Department of Health

and Human Resources ("the Department"), filed a verified Petition to Institute Child Abuse

and Neglect Proceedings ("Petition") against the mother in relation to her minor children,

B.H. and S.S.[4] The father was also a named respondent in the proceeding, although there

were no allegations of either abuse or neglect against him in the Petition.[5] The Department

alleged that the mother was in a personal relationship with a registered sex offender, John

[4]B.H. was born in 2004, and S.S. was born in 2001. The children were initially placed in foster care, then with their paternal grandparents, and ultimately with their father, as more fully discussed *infra*. Although the mother's oldest child was also named in the Department's Petition, he reached the age of majority during the pendency of the proceeding and was no longer a party at the time of disposition.

[5]After the father was served with the Petition, he sought custody of his children as the non-offending parent. The father admittedly had no contact with his children for an extended period of time. During a hearing before the circuit court, the father acknowledged that he had previously attempted to voluntarily relinquish his parental rights to B.H. and S.S., an action that he attributed to the mother's interference with his attempts to have contact with his children, as well as her transient lifestyle, both of which prevented him from maintaining contact with his children.

2

Bailey; that the mother exposed her children to Mr. Bailey, as well as his friend, Andrew Oldaker, a registered sex offender with whom the mother, her daughters, B.H. and S.S., and Mr. Bailey lived for a period of time; and that S.S. and B.H. were sexually abused on multiple occasions by Mr. Bailey and other sex offenders with whom the mother associated.[6] The Department took emergency custody of the children and, on December 6, 2011, the circuit court ordered that the legal and physical custody of B.H. and S.S. remain with the Department. The mother waived her preliminary hearing and the matter proceeded to adjudication.

During the January 10, 2012, adjudicatory hearing, the circuit court accepted the mother's stipulation wherein she stated, in part, as follows:

> 3. The father of [B.H. and S.S.] is Randy [H., Jr.] whose whereabouts are unknown.
> • • • •
> 7. The respondent-mother admits to the neglect of the above-named children as follows:
> > 1. No permanent residence at the time of filing the petition.

---

[6]The following is an example of the abuse alleged in the Department's Petition:

> On or around December 1, 2011, [S.S.] stated that John took her the night before and threw her on the bed then ripped . . . her pants off and stuck his fingers in her spot and pointed at her vaginal area. She stated that he also made her rub his chest. [S.S.] stated that it never stops. She stated that sometimes she does not mind it because if she does things with him he buys her really cool stuff.

3

2. She and her children were residing with John Bailey, a registered sex offender.

3. She was aware that John Bailey and Andrew Oldaker were registered sex offenders, and failed to protect her children by allowing them to be around John Bailey and Andrew Oldaker.

4. That as a result of being around John Bailey and other individuals who are registered sex offenders, her children were subjected to sexual abuse.

8. Based upon these stipulations, the children are neglected children within the meaning of the West Virginia Code 49-6-1 et al.

On January 17, 2012, the circuit court entered an order adjudicating the children abused and neglected and awarding the mother a six-month post-adjudicatory improvement period. The primary goals of the improvement period were to aid the mother in improving her self-esteem; to help her gain insight into how her children had been harmed through their exposure to registered sex offenders; and to teach her how to identify and recognize sex offenders, how to prevent the sexual abuse of her children, and how to provide them with a safe and secure home, free from exposure to sex offenders. The improvement period also allowed the mother to have supervised visitation with her daughters.

Thereafter, periodic review hearings were held before the circuit court to ascertain how the mother was doing in her improvement period. While the mother complied

4

with certain aspects of her improvement period, in other areas she experienced difficulties.[7]

In Child Protective Services ("CPS") worker Amanda Damron's April 3, 2012, hearing update, she reported that the mother had knowingly started dating and living with another sex offender, Patrick Trembly. CPS worker Damron further reported that the mother indicated that Mr. Trembly was fighting his "wrongful conviction" and that she believed he is innocent.[8]

In CPS worker Damron's update for the July 9, 2012, review hearing, she reported that the mother "seemed to understand what the appropriate boundaries should be with [B.H. and S.S.], but in the next visit, she did nothing that she and the worker [the

---

[7]The concerns reported by the service provider and the child protective services worker included the mother's difficulty in understanding the safety concerns that arise when she allows S.S. to use her cell phone to access Facebook in her effort to find "dates" for her mother; the mother being "very untruthful at times[;]" the mother's inability to see the mistakes that she continues to make with the children despite her ability to verbalize her past mistakes; and the mother not retaining the information discussed at her parenting classes.

[8]Although Ms. Damron indicated in her May, 23, 2012, hearing update that there had been no further reports of the mother being in a relationship with a sex offender at that time, the appendix record contains the mother's testimony that she lived with Mr. Trembly until June 2012 and that she "broke it off" with him after learning that he was a registered sex offender, although she still agreed "to help him go over his papers[,]" "as a friend." When questioned regarding her claim that she had learned from her mistake with John Bailey given her relationship with Mr. Trembly, the mother responded that "[she] learned not to have [registered sex offenders] around my kids[]" and Mr. Trembly "wasn't around my children because they were with CPS." Admittedly, the mother did not have custody of her children due to her relationships with registered sex offenders, which led to the sexual abuse of her daughters.

parenting provider] talked about." Ms. Damron further reported that the parenting provider

was "very uneasy at the thought of unsupervised visitation."

In late August 2012, the mother filed a motion for a ninety-day extension of

her improvement period, which the circuit court granted. Approximately one month into the

ninety-day extension, CPS worker Damron reported that the mother had started weekend

visitations with her children under the supervision of her maternal aunt. Ms. Damron

concluded her October 2012 report by expressing continuing concern that the mother will not

be protective of the children based on the parenting provider's impression that the mother

still does not believe that John Bailey is a sex offender[9] but says that she does so as to appear

protective.[10] In late November 2012, CPS worker Damron filed another hearing update in

---

[9]During the disposition hearing, the mother testified that she knew John Bailey was a pedophile when she was dating him but did not believe that he was because she was told that his victim "was 16 and he was only a couple years older, and that, to me, does not make you a pedophile." The mother further testified that she ended her relationship with John Bailey, not because he was a registered sex offender and a pedophile, but because she "didn't approve of the way he was yelling at [her children]."

[10]This October 2012 report also reflects that the parenting provider questioned the mother about "Jerry," a friend of John Bailey and a registered sex offender whom S.S. said had sexually abused her. The appendix record reflects that "Jerry" shared one bed in a hotel room with B.H. and S.S. while the mother and John Bailey shared the other bed. The mother told the provider that she did not know that "Jerry" was a registered sex offender at the time. When the provider asked the mother why it would be appropriate for her to allow her daughters to be in a bed with a grown male, regardless of whether she knew that person was a registered sex offender, the mother responded that she has no "common sense" and does not "think of those types of things[.]"

which she reported that while the mother had complied with the terms and conditions of all services,[11] she "continue[d] to be concerned that [the mother] will not be protective of the children in the future" and that "the provider's account of [the mother's] diminished decision making skills . . . will cause safety concerns for the children if they were to be in [the mother's] complete care."[12] In recognition of these continuing concerns, when the circuit court awarded the mother unsupervised visitation by order entered December 10, 2012, the court directed that only the mother and the children's maternal grandmother[13] could be present and that "the [Department], provider or the Guardian ad Litem shall follow-up immediately after the visitations to make sure they are appropriate."

---

[11]The appendix record reflects that the terms and conditions of the mother's improvement period included her participating in parenting classes, adult life skills classes, and a domestic violence group to teach her independence and the ability to build healthy relationships that do not put her children at risk; participating in group and individual therapy geared toward improving her self-esteem; complying with her psychiatric treatment; attending the children's therapy appointments; maintaining a safe and stable household for her children; and participating in the supervised visitation with her children.

[12]In her November 2012 update, Ms. Damron also reported on a recent Multi-Disciplinary Team meeting during which the parenting provider advised that the mother would have "difficulty recognizing safety concerns early enough to prevent the children being harmed in the future[;]" and that unsupervised visits, if any, should be solely between the mother and the children given the mother's difficulty in choosing appropriate people with whom to associate.

[13]During the course of this proceeding, the mother moved into the basement apartment of her mother's home. Counsel advised the Court during oral argument that the mother continues to reside in this apartment.

In CPS worker Damron's final report to the circuit court, she advised that the mother's unsupervised visitations began the prior month in the basement apartment of her mother's home where she was residing, and that the visitations went well. Ms. Damron further advised that while the mother had complied with services, the Multi-Disciplinary Team ("MDT") members continued to be concerned that she had "not changed her behavior enough to ensure that she will not expose her children to inappropriate people." Ms. Damron concluded her report by stating that all MDT members, except the mother, agreed that the best interests of the children would be served by allowing them to remain in the primary custody of their father with a visitation plan for the mother.

On February 5, 2013, the disposition hearing was held during which Ms. Damron testified consistently with her final report, as discussed above. The mother testified that she now understands that it is important to keep her children away from certain kinds of people; that she was attracted to these people because they "paid attention" to her; that she learned how to determine "whether these guys are on the sex offender list[;]" that her self-esteem had improved; and that she "blame[d]" Parkersburg, West Virginia,[14] for her relationships with three different sex offenders. The father testified that the children had been living with him, his wife, and his other daughter for approximately four months; that

[14]The mother previously resided in the state of Ohio.

their school attendance had been excellent; that both girls were on the honor roll at school; and that both girls feel safe and know that they have a stable home.

At the conclusion of the disposition hearing, the Department's counsel advised that the children's best interest would be served by terminating the mother's custodial rights and allowing the children to remain with their father while giving the mother visitation. The GAL concluded that it was in the children's best interest to remain with their father with frequent and liberal visitation with their mother.[15]

On March 13, 2013, the circuit court entered its first Disposition Order in which it terminated the mother's custodial rights[16] and adopted the Parenting Plan proposed by the MDT, which made the father the primary residential parent and gave the mother

---

[15]The GAL also expressed concern to the circuit court regarding the mother's relationship with Patrick Trembly and her "lack of insight into these issues[,]" including that she blamed Parkersburg, West Virginia, for her association with sex offenders. As the GAL observed, "I think it's the mother's choices and where she puts herself and where she ends up." While acknowledging that the mother had completed her improvement period, the GAL also stated that "when it comes down to where do the kids go, I think the bottom line is right now they're in a safe place. They're in a stable environment with their father, and I don't think we need to risk that again by putting them back with the mother."

[16]Although the Department appeared to withdraw its recommendation to terminate the mother's custodial rights near the conclusion of the disposition hearing, the Department's counsel drafted this initial Disposition Order, which terminated the mother's custodial rights.

unsupervised visitation with the children.[17] In its Corrected Disposition Order entered during the pendency of this appeal, the circuit court did not terminate the mother's custodial rights. Instead, the circuit court found that the mother had "substantially complied" with the terms and conditions of her improvement period,[18] but that it was in the children's best interest that their father be appointed as their "primary residential parent." The circuit court stated in this order that it had considered the children's wish to remain in the primary custody of their father, as well as the "totality of circumstances in the case, including but not limited to the academic performance of the children while living with their father and the safe and stable environment they have enjoyed while living there[.]" The circuit court again adopted the MDT's proposed Parenting Plan[19] and dismissed the proceeding from the court's docket.[20]

---

[17]The MDT's Parenting Plan provides the mother with overnight visitation with the children every Wednesday; visitation every other weekend from 7:00 p.m. on Friday to 7:00 p.m. on Sunday; the parents alternate weeks during the summer school break; the mother has the children on her birthday and Mother's Day and the father has them on his birthday and Father's Day; the father has the children until 1:00 p.m. on Thanksgiving day and the mother has them the remainder of that day; the father has the children until 6:00 p.m. on Christmas Eve and the mother has them Christmas night and Christmas day; and the parents alternate years having the children during their Christmas break from school. The mother, also a member of the MDT, did not agree with this Parenting Plan because she believes that she should be the primary custodial parent.

[18]*See supra* note 11 for a discussion of these terms and conditions.

[19]During oral argument before this Court, counsel advised that the parents had been following this Parenting Plan since its initial adoption in the Disposition Order entered on March 13, 2013. *See supra* note 3.

[20]The circuit court's Corrected Disposition Order also advised the father that both the Corrected Disposition Order and the Parenting Plan should "be ratified by the Original Court
(continued...)

10

During oral argument before this Court, all parties agreed that the mother's first assignment of error challenging the termination of her custodial rights in the circuit court's first Disposition Order was mooted by the entry of the Corrected Disposition Order. Thus, the sole remaining issue on appeal is whether the circuit court erred in awarding primary custody of B.H. and S.S. to their father.

## II. Standard of Review

We are asked to review a circuit court's disposition order entered upon a petition for termination of parental rights. Our standard of review in this regard is well established:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed

[20](...continued)
of Jurisdiction which previously addressed the legal custody and support issues." Without further information from either the parties or the appendix record in this regard, we presume the circuit court was referring to the court in which the parties were divorced.

11

in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011). As we have previously explained, "a circuit court's substantive determinations in abuse and neglect cases on adjudicative and dispositional matters—such as whether neglect or abuse is proven, or whether termination is necessary—is entitled to substantial deference in the appellate context." *In re Rebecca K.C.*, 213 W.Va. 230, 235, 579 S.E.2d 718, 723 (2003) (internal citations omitted). With these principles in mind, the parties' arguments will be considered.

## III. Discussion

In the present appeal, the mother asserts that the circuit court erred in granting primary custody of B.H. and S.S. to their father as she had substantially complied with the terms of her post-adjudicatory improvement period; the children had lived with her solely since they were infants; and she had been denied an adequate period of unsupervised visitation to demonstrate what she had learned from her improvement period. We begin our analysis of this issue by acknowledging that

> "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996). Indeed, ""[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. pt. 1, *State ex rel. Cash v. Lively,* 155 W.Va. 801, 187 S.E.2d 601 (1972).' Syllabus Point 4, *State ex rel. David Allen B. v.*

12

*Sommerville*, 194 W.Va. 86, 459 S.E.2d 363 (1995)." Syl. Pt. 2, *In the Interest of Kaitlyn P.*, at 123-124, 690 S.E.2d at 131-132.

*In re Timber M.,* 231 W.Va. 44, __, 743 S.E.2d 352, 361 (2013). Further, although parents have substantial rights, "'courts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened . . . .' Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syl. Pt. 4, in part, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

In the case-at-bar, the mother's post-adjudicatory improvement period provided her with "'an opportunity . . . to modify . . . her behavior so as to correct the conditions of abuse and . . . neglect with which . . . she ha[d] been charged.' *In re Emily*, 208 W.Va. at 334, 540 S.E.2d at 551." *In re Isaiah A.*, 228 W.Va. 176, 184, 718 S.E.2d 775, 783 (2010). As this Court has previously directed,

> [a]t the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and *whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child*.

Syl. Pt. 6, *In Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991) (emphasis added). While the circuit court acknowledged the mother's substantial compliance with the terms and conditions of her improvement period, we have recognized that "'it is possible for an

individual to show "compliance with specific aspects of the case plan" while failing "to improve . . . [the] overall attitude and approach to parenting.' *W.Va. Dept. of Human Serv. v. Peggy F.*, 184 W.Va. 60, 64, 399 S.E.2d 460, 464 (1990)." *In re Jonathan Michael D.*, 194 W.Va. 20, 27, 459 S.E.2d 131, 138 (1995). Moreover, "'[t]he assessment of the overall success of the improvement period lies within the discretion of the circuit court . . . . "regardless of whether . . . the individual has completed all suggestions or goals set forth in family case plans."' *In Interest of Carlita B.*, 185 W.Va. 613, 626, 408 S.E.2d 365, 378 (1991)." *In re Jonathan Michael D.*, 194 W.Va. at 27, 459 S.E.2d at 138.[21]

In reviewing the circuit court's rulings in the case *sub judice*, we remain mindful that

> whenever a child appears in court, he is a ward of that court. W.Va. Code § 49–5–4 (1996); *Mary D. v. Watt*, 190 W.Va. 341, 438 S.E.2d 521 (1992). Courts are thus statutorily reposed with a strong obligation to oversee and protect each child who comes before them. As Justices Cleckley and Albright stated in *West Virginia Department of Health and Human Resources ex. rel. Wright v. Brenda C.*, 197 W.Va. 468, 475 S.E.2d 560 (1996), "[a]bove all else, child abuse and neglect proceedings relate to the rights of an infant." *Id.* at 477, 475 S.E.2d at 569.

---

[21]West Virginia Code § 49-6D-3 (2009 & Supp. 2013) requires the Department to develop and file a family case plan if the circuit court awards an improvement period to a parent. While the appendix record reflects that the terms and conditions of the mother's post-adjudicatory improvement period were presented to and approved by the circuit court, the parties' briefs never refer to a family case plan. While we presume that such a plan was developed in the instant proceeding, we nonetheless remind both the Department and the circuit courts of the statutory requirement for such plans.

*State v. Julie G.*, 201 W.Va. 764, 776, 500 S.E.2d 877, 889 (1997) (J. Workman, dissenting).

Further, as we stated in *In re Timber M.*, 231 W.Va. 44, 743 S.E.2d 352 (2013),

> [I]t is clear from our [child abuse and neglect] procedural rules, as well as our prior case law, that "[t]here cannot be too much advocacy for children." *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 570, 490 S.E.2d 642, 657 (1997) (Workman, C.J., concurring). Indeed, if one thing is firmly fixed in our jurisprudence involving abused and neglected children, it is that the "polar star test [is] looking to the best interests of our children and their right to healthy, happy productive lives[.]" *In re Edward B.*, 210 W.Va. 621, 632, 558 S.E.2d 620, 631 (2001). This Court has repeatedly stated that a child's welfare acts as "the polar star by which the discretion of the court will be guided." *In Re: Clifford K.*, 217 W.Va. 625, 634, 619 S.E.2d 138, 147 (2005) (internal citation omitted).

231 W.Va. at __, 743 S.E.2d at 367-68.

Grounded in these same fundamental principles, this Court observed that "[t]he question at the dispositional phase of a child abuse and neglect proceeding is not simply whether the parent has successfully completed his or her assigned tasks during the improvement period. Rather, the pivotal question is what disposition is consistent with the best interests of the child." *In re Frances J.A.S.*, 213 W.Va. 636, 646, 584 S.E.2d 492, 502 (2003). Indeed, the overriding consideration must be whether the issues that brought about the allegations of abuse and/or neglect have been addressed by the parent in a substantive and effective manner, and whether those conditions of abuse and/or neglect have been

15

sufficiently remedied such that it is in the child's best interests to be returned to the parent's custody.

Based on our prior precedent and long history of unwavering concern for the health and well-being of children, we now hold that in making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child.

In the present appeal, although the mother substantially complied with the terms and conditions of her improvement period, there were continuing concerns that she would again become involved with inappropriate individuals and thereby continue to expose her daughters to the serious risks attendant with such ill-advised associations. We observe that there is evidence for these concerns in the appendix record.

As previously indicated, the mother stipulated that she was aware that John Bailey and Andrew Oldaker were registered sex offenders; that she failed to protect her children by allowing them to be around Messrs. Bailey and Oldaker; and, that as a result of being around Mr. Bailey and other individuals who are registered sex offenders, her children were subjected to sexual abuse. The appendix record also reflects that the mother continued

16

her relationship with John Bailey after learning that he was a registered sex offender because she believed he was innocent. In fact, as late as October 2012, a parenting provider reported that the mother still did not believe that John Bailey is a registered sex offender, but says that she does so as to appear protective of her children. Moreover, during the mother's improvement period, she entered into a relationship with yet another registered sex offender, Patrick Trembly. She endeavored to excuse this relationship on the basis that her daughters were never around Mr. Trembly because they were in the Department's custody.[22] Further, as with John Bailey, after learning that Mr. Trembly was a registered sex offender, the mother believed he was innocent and agreed "to help him go over his papers[,]" "as a friend."

We recognize the difficulty that the circuit court confronted in terms of assessing whether the mother had made "sufficient improvement . . . in the context of all the circumstances of the case to justify the return of the child[ren]." Syl. Pt. 6, in part, *Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365. Unlike an abuse and neglect proceeding that involves a dirty home or a parent abusing drugs, where a parent's success in an improvement period can be measured in concrete terms of whether the home is clean or the parent's drug screens are negative, here, the circuit court had to assess whether the mother had internalized what the service providers endeavored to teach her during her improvement period and whether

---

[22]Again, the children were in the Department's custody due to the mother's relationships with registered sex offenders and her failure to protect her children.

she would, in fact, protect her children by avoiding relationships with individuals in whose presence her children were placed at risk of abuse.

In addressing this difficult question, the circuit court had the benefit of numerous improvement period review hearings during which it was advised of continuing concerns about unsupervised visitation and whether the mother would protect her daughters if they were under her full-time care. At disposition, CPS worker Damron summarized for the circuit court the children's circumstances prior to the instant proceedings when they were residing with the mother: "[T]hey moved several times, missed several days of school, their grades were suffering, and ultimately the children were sexually abused as a result of the mother exposing the children to inappropriate individuals because she put her need to have a relationship above the children's need for safety." Ms. Damron also advised the circuit court that after the children were removed from the mother, they have

> excelled in their school work and also their attendance. The children have enjoyed playing basketball and other after school activities that they have never been able to participate in before. The children have a routine every day that creates a safe and stable environment for them and allows them to actually act their age. The children reside full time with their father, who is providing a safe and stable home for them. There have been no safety concerns raised while they have resided with their father.[23]

---

[23]After the children were removed from foster case and placed in the home of their paternal grandparents in May 2012, the MDT regularly monitored and discussed the contact

(continued...)

(Footnote added.). The circuit court received multiple recommendations at disposition that the best interests of the children would be served by remaining in the primary custody of their father with visitation to the mother, which is what the children desired, as well. *See Matter of Brian D.*, 194 W.Va. 623, 636, 461 S.E.2d 129, 142 (1995) ("Cases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren). . . . and [the children's] own feelings and emotional attachments should be taken into consideration by the lower court.").

As we have previously held, "'[t]o justify a change of child custody, in addition to a change in circumstances of the parties, it must be shown that such change would materially promote the welfare of the child.' Syl. Pt. 2, *Cloud v. Cloud*, 161 W.Va. 45, 239 S.E.2d 669 (1977)." Syl. Pt. 5, *In re Frances J.A.S.*, 213 W.Va. 636, 584 S.E.2d 492 (2003). During oral argument, counsel advised this Court that the parents have been following the MDT's Parenting Plan since it was first adopted by the circuit court in March 2013, and that there have been no concerns raised concerning the welfare of the children during that time. Accordingly, based upon our review of the appendix record, the relevant law, and the parties' arguments, and giving substantial deference to the circuit court's dispositional

---

[23](...continued)
between the children and their father, who lived nearby. Progressively, the children developed a relationship with their father and went to live in his home in October 2012.

19

decision,[24] this Court concludes that the circuit court's adoption of the MDT's Parenting Plan serves the best interests of B.H. and S.S. by fostering their bond with their mother[25] through liberal unsupervised visitation while simultaneously insuring their safety and materially promoting their welfare by allowing primary custody to remain with their father.

Lastly, we address the mother's argument that she was not given sufficient unsupervised visitations to permit her to demonstrate the full extent of what she had learned from her improvement period.[26] As indicated above, any delay in ordering unsupervised visits was due to the mother's actions and conduct, which led to continuing concerns that she would not protect her daughters from additional acts of abuse. Although the circuit court awarded the mother unsupervised visitation in December 2012, in the face of these continuing concerns, it also directed that the only persons who were to be present during the unsupervised visitation were the mother and the children's maternal grandmother and that the Department, its services provider, or the GAL were to follow-up immediately after such visitations to ensure their appropriateness. The unsupervised visitation began the following month.

---

[24]*See In re Rebecca K.C.*, 213 W.Va. at 235, 579 S.E.2d at 723.

[25]The GAL stated in his dispositional hearing report that the children were bonded with both parents.

[26]The mother began requesting unsupervised visitation in July 2012.

20

Based on all of the above, we find that the mother had ample opportunity during her improvement period to demonstrate that she had learned and internalized how to make better parenting decisions and better choices in terms of the persons with whom she chooses to associate so as to protect her daughters. Consequently, any delay in awarding unsupervised visitation was due to the mother's behaviors and actions which caused continuing concern for the children's safety. Accordingly, we find no error in this regard.

## IV. Conclusion

Based upon this Court's thorough review of this matter and for the foregoing reasons, the Circuit Court of Wood County's Corrected Disposition Order awarding primary custody of B.H. and S.S. to the father with liberal visitation to the mother is hereby affirmed.

Affirmed.

21