**FILED**
**June 14, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**January 2021 Term**

_____

**No. 20-0698**

_____

**IN RE: M.O.**

_____

**Appeal from the Circuit Court of Wood County**
**The Honorable Robert A. Waters, Judge**
**Civil Action No. 18-JA-168**

**AFFIRMED**

_____

**Submitted: May 5, 2021**
**Filed: June 14, 2021**

**F. John Oshoway**
**Grantsville, West Virginia**
**Attorney for the Petitioner**

**Jessica E. Myers**
**Myers Law Offices**
**Parkersburg, West Virginia**
**Guardian ad Litem**

**Patrick Morrisey**
**Attorney General**
**Jessica A. Lee**
**Assistant Solicitor General**
**Lee Niezgoda**
**Assistant Attorney General**
**Charleston, West Virginia**
**Attorneys for the Respondent,**
**West Virginia Department**
**of Health and Human Resources**

**CHIEF JUSTICE JENKINS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected.  These findings shall not be set aside by a reviewing court unless clearly erroneous.  A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety."  Syllabus point 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.      "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children."  Syllabus point 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996).

i

3. "At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child." Syllabus point 6, *In Interest of Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991).

4. "In making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child." Syllabus point 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014).

**Jenkins, Chief Justice:**

In this appeal of the July 27, 2020 dispositional order entered by the Circuit Court of Wood County, West Virginia, Petitioner Father, A.O.[1] ("Father"), asserts that the circuit court erred in terminating his improvement period and terminating his parental rights to his son, M.O. Both the West Virginia Department of Health and Human Resources ("DHHR") and the guardian ad litem maintain that termination of Father's improvement period and parental rights was warranted despite his earlier compliance with the services provided during his improvement period. Upon review of the parties' briefs and oral arguments, the submitted appendix record, and the pertinent authorities, we find no error in the circuit court's decision to terminate Father's improvement period and parental rights to his son and, therefore, affirm the circuit court's order.

## I.

## FACTUAL AND PROCEDURAL HISTORY

In October of 2018, the DHHR filed an abuse and neglect petition against A.C.,[2] the mother of J.C., H.C., and M.O., stating that she had a substance abuse problem

---

[1] As in all cases involving sensitive facts and minor children, we use initials and titles to identify the parties. *See* W. Va. R. App. Proc. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] From review of the record before us, it appears that A.C.'s parental rights have been terminated, and she has not appealed that termination. She is not the subject of the instant appeal. The permanency plan for M.O. is adoption by his current foster family.

that was impairing her ability to safely and appropriately parent the children.[3] An amended petition was filed in March of 2019 which added allegations against Father. The amended petition alleged that shortly after the original petition was filed, the DHHR "became aware [Father] also had substance abuse issues. He began screening positive for methamphetamines." The amended petition further stated that on January 11, 2019, Father went to a detox facility and was later admitted into the Amity Center. Subsequently, he was transferred to a long-term treatment facility, Prestera, in Huntington, West Virginia. His completion date was scheduled for June of 2019. Accordingly, the amended petition asserted that Father "has a substance abuse issue that is impairing his ability to safely and appropriately parent[ M.O.;]" that at the time of the filing of the original petition, Father did not have safe and appropriate housing for the child; and that at that time "he was never compliant with [the] DHHR."[4]

Father asserts that, prior to his release from the Prestera treatment facility, he entered into a stipulation admitting that he had been abusive and/or neglectful of M.O., and received a post-adjudicatory improvement period to correct the issues identified with his substance abuse and lack of safe and appropriate housing.

---

[3] J.C. and H.C. have a different father than M.O. and are not the subject of the current proceedings.

[4] Father asserts in his brief that a second amended petition was filed in 2019 alleging abuse and neglect against M.B., the father of J.C. and H.C. This second amended petition was not included in the appendix on appeal. However, M.B. is not the subject of the instant appeal.

2

According to an October 31, 2019 document titled "Terms of Post Adjudicatory Improvement Period," Father had been complying with most terms and conditions of his post-adjudicatory improvement period; however, he failed to comply with one term. In particular, Father was seen at a health services facility with M.O.'s mother after being advised to discontinue contact with her. Additionally, it was noted that while Father had technically complied with the term that he attend visitation with his son, "there [were] still concerns with [Father's] level of confidence and how he can effectively parent [M.O.] without intervention from the service provider." The report's summary stated that

> [Father] has been complying with some of his terms and conditions, however, there is a great concern about an ongoing relationship with [the mother]. [Child Protective Services Worker] has concerns with [Father's] ability to be a protective parent to [M.O.] [Father] has also had issues with visitation regarding his confidence and being able to apply learned parenting techniques.

At this point, the Child Protective Services Worker ("CPSW") recommended ending the improvement period and setting the matter for disposition.

A status hearing was held on January 13, 2020. During this hearing, the circuit court noted that Father was doing well and that unsupervised visitations could begin and set a final review hearing in thirty days. A February 18, 2020 updated report noted that Father had "complied with all his terms and conditions." The updated recommendation was for the DHHR to continue to have "custody of [M.O.] and allow him to live with [Father] for a trial reunification. CPSW will keep safety services in the home with [Father] to allow for additional support during the reunification process."

3

Following the updated report, a hearing was held on February 19, 2020. The DHHR indicated that while Father had done well during his improvement period, "[t]o continue to finish out that transition and still provide [Father] with services, [it] would just ask that the [circuit court] set this out for disposition in about 45 days." The DHHR further stated that "[b]y then, the [DHHR] believes that the transition will be complete and that will give sufficient time for that, as well as to continue providing services to [Father] to assist him with that transition." Counsel for Father inquired whether the court could simply dismiss the petition that day and continue with some services for the next few months. However, the DHHR offered that reunification services, rather than just safety services could be offered if the case remained open. Ultimately, the court ruled that if more services would be available to Father if the case remained open, it would leave it open and set disposition in approximately forty-five days. As a result, a dispositional hearing was set for April 13, 2020, and the court instructed Father to "stay in touch with everybody."

Subsequently, on two occasions in late March and early April of 2020, Father failed to appear for his drug screen. As a result, the CPSW became concerned and called a service provider to check on Father and M.O. As more fully described below, on April 13, 2020,[5] during the home check, Father eventually admitted to relapsing and using marijuana. Consequently, the CPSW directed that M.O. be removed from the home. After

---

[5] The previously scheduled April 13, 2020 dispositional hearing was continued to June 26, 2020, due to the COVID-19 global pandemic and corresponding judicial emergency orders entered by this Court.

removal, Father had one diluted and five positive drug screens from April 13, 2020, to May 7, 2020. Four of the positive drug screens showed the presence of marijuana, and one positive drug screen indicated the presence of both marijuana and benzodiazepines. Father began testing negative for all substances on the drug screens he submitted to after May 7, 2020. Furthermore, after removal, Father attended one Multidisciplinary Treatment ("MDT") team meeting but did not have any visitations with his child.

On June 26, 2020, the circuit court held a dispositional hearing regarding Father. At the outset, the circuit court noted that the matter had been "somewhat affected by the COVID-19 virus situation." Specifically, the April 13, 2020 dispositional hearing had been continued due to the related judicial emergency. Additionally, the court recounted that, shortly following the February 19, 2020 review hearing, there had been a development in this matter, and the DHHR had removed M.O. from Father's home.[6] Counsel for the DHHR stated that the CPSW "ha[d] had very sporadic contact with [Father] via text message mostly regarding his [drug] screens, but he has not reached out to the Department to have any other -- he's not reached out to the Department."

The DHHR presented three witnesses at the hearing. First, the CPSW assigned to the case involving M.O. testified that M.O. had been returned to Father on a

---

[6] At this point, Father had not yet appeared at the hearing. In fact, counsel for Father stated that he had not had any contact with Father since the February 19, 2020 hearing.

trial basis, but that the DHHR had maintained legal custody. During this trial reunification the DHHR had services for Father. Shortly after the trial reunification period began, Father failed to appear for two drug screens. After the first missed drug screen, the CPSW reached out to Father who informed her that both he and M.O. were ill. After Father missed the second drug screen, the CPSW once again contacted Father who once again told her that both he and the child were ill. Father explained that M.O. had a very high fever and that he had tried to contact the pediatrician's office; however, the CPSW called the doctor's office and found Father's representations were not true. As a result, the CPSW reached out to the Families Forward service provider, Charlotte Templeton ("Ms. Templeton"), to go to Father's home and perform a safety check. Based on her conversation with Ms. Templeton, the CPSW made the decision to remove M.O. from Father's home on April 13, 2020. After the child was removed, Father told the CPSW "he knew he messed up, but that he was just bored. He was bored, so that's why he had a relapse." Father further told the CPSW that "he had gotten high" and "that he had left M[.O.] with a friend of his from recovery[.]" The CPSW testified that this person had not been previously approved by the DHHR to care for M.O.[7]

Additionally, the CPSW stated that, during the period of February of 2020 to the time of the June 26, 2020 hearing, there were several services offered to Father. These

---

[7] There was testimony that the DHHR had services in place so that Father could have approved day care if needed.

services included: parenting and life skills, safety services, and drug screening. Father previously had been attending substance abuse meetings; however, "when everything started with COVID[-19], he tried a couple of classes on-line and he just didn't really like it, so he stopped[.]" Further, the CPSW stated that in the beginning of this case, Father "was chronically using methamphetamines. [Father] was high risk for relapse and [he] has also never had a child of his own before. [Father] has stated to caregivers that he did not feel comfortable at times." The CPSW testified that "the parenting providers and the visitation providers all [had] recommendations of [Father] continuing with some services just to be sure that he would be able to be successful as a parent."

Moreover, the CPSW testified that since M.O. had been removed from Father's home in April of 2020, Father had rarely contacted the DHHR to check on his son. Specifically, the day after removal, Father texted the CPSW to see how M.O. was doing. Then, the CPSW heard from him again around May 24, 2020, to check on M.O. However, there were no other messages exchanged between Father and the CPSW regarding M.O.[8] The CPSW stated that the only time Father requested visitation with his son was the day after the child was removed. When a later MDT was held, Father did not ask again for visitation.

---

[8] There were a few other messages exchanged between the CPSW and Father regarding a missed drug screen and to ensure that Father continued his drug screening.

Next, Ms. Templeton, the Families Forward service provider testified. Ms. Templeton stated that from February of 2020 to April of 2020, she would, at least once a week, go to Father's home to ascertain if he had any questions, needed help with child care, or if he needed any other kind of assistance for the child. Ms. Templeton described these services as pre-unification services, which entailed safety checks. She explained pre-unification services as follows:

> Actually going in the home, helping him [] take the child's temperature. That's pre-unification, you know, services. Helping him -- say if the child was to get head lice, showing him how to treat head lice, those type of things. Helping him plan menus, meals, because at first he was cooking adult style meals. I told him he needed to do more with kid-friendly meals. So[,] I got him information from the WIC office and so he started incorporating more kid-friendly fruits and vegetables and things like that.

Ms. Templeton stated that she did not provide formal parenting classes after M.O. had been returned to Father's home.

Ms. Templeton further testified that she went to Father's residence on April 13, 2020. Despite Father informing her that the child was ill, M.O. did not appear to be visibly sick. Additionally, after initially stalling completing the drug screen, Father admitted to Ms. Templeton that he had recently used marijuana. Specifically, he told her, "Yeah, I'm dirty. I got bored[,] and I smoked pot." At that point, after learning this information, the CPSW directed Ms. Templeton to remove M.O. Ms. Templeton testified that, by this point, Father seemed overwhelmed by parenting: "He was very, very stressed,

8

very overwhelmed. He was quick to lose his patience with [M.O.]." In her opinion, Father was not capable of taking care of a two-year-old child.

Finally, a Wood County Day Report Center service provider, Laura Rush ("Ms. Rush"), provided testimony. Ms. Rush stated that Father had been enrolled in a random drug screening program since July 2, 2019. Ms. Rush recounted that, on March 24, 2020, Father failed to show; that he screened negative on March 31, 2020; and on April 10, 2020, he was once again a no show. Then, on April 13, 2020, Father's drug screen result was diluted. He was once again a no show on April 16, 2020. On April 20, 24, 27, 30, and May 7, Father's drug screens all tested positive. After May 7, 2020, he appeared for all drug screens, and they all remained negative.

At the end of the presentation of the DHHR's evidence, after prompting by his counsel, Father finally appeared in the courtroom. The circuit court found that it would "probably be unfair to make [Father] go forward with his evidence [that day]." Accordingly, the court asked for an "impromptu MDT" and continued the hearing until July 23, 2020, at 3:00 p.m.

The dispositional hearing reconvened on July 23, 2020. Counsel for Father stated that Father had not been in touch with him lately.[9] Counsel for the DHHR indicated

---

[9] Counsel was ill and appeared via telephone.

that Father had been in contact with different workers from the DHHR and then reiterated its previous position:

> given that there was such a short period of time that [Father] had the child back, [M.O.] back into his home, that he was unable to keep his sobriety and that he did relapse, and the fact that this case has been ongoing for such an extensive amount of time, and the fact that [Father] has already participated in a short-term as well as a long-term substance abuse treatment program during this, our position would be that we believe that the parental rights of [Father] to [M.O.] should be terminated.

The guardian ad litem echoed the same sentiments as the DHHR. Specifically, the guardian ad litem stated that

> what is most disturbing . . . is since that time [of removal], I've gotten the impression that [Father] has kind of checked out. I think that I would certainly have a different position if he was at the last hearing, if he was asking for visitation, which I think-- I noted that he came in late, but [his counsel] didn't request visitation even then.
>
> So I think that's really what -- not so much the relapse or the use back in April, but the fact that when we removed the child from him, took him back into care, that [Father] has not really been a full participant. So that's why I agree with . . . the Department's position to terminate his parental rights.[10]

Father failed to appear at the hearing. His counsel argued that while Father relapsed, it "occurred [during] the lockdown from the virus, and he was under a lot of

---

[10] The DHHR noted that there was potentially a visit scheduled between Father and M.O. for that same evening.

stress, he wasn't able to work, and I just think that it was very unusual circumstances that led him to relapse." In response, the guardian ad litem stated that

> I mean, when we place children back in the homes, there's going to be stressful situations. People are going to lose jobs. They may have a breakup with a loved one. They may have an illness. And anytime someone's put under stress, we need to be able to know they're going to be able to handle it rather than to turn back to substance abuse, which I think that's exactly what happened here.

After noting that it was concerned that Father failed to appear at the hearing, the court terminated Father's parental rights. In reaching this decision, the court identified several other concerns, including Father's inconsistency, his relapse after the child had been in his care only a short period of time, and his very long history of substance abuse. The court stated that "there's something going on with [Father] that indicates he's not going to be able to take care of his child in an appropriate manner. So[,] it's not in the best interests of the child to have reunification."

Following the hearing, the circuit court entered its dispositional order on July 27, 2020. The circuit court noted that Father failed to appear at the dispositional hearing. Furthermore, the court found that the DHHR had "made reasonable efforts to reunify the family by providing services to [] Father through an improvement period and an extension of his improvement period." Additionally, the circuit court concluded that Father had a "very long history of substance abuse" and had "been in drug [c]ourt, long-term treatment, and short-term treatment." However, "[a]fter only a short period of time of the child being back in [Father's] home, [Father] relapsed." The court determined that Father was "still

11

unable to maintain his sobriety and adequately take care of his child." Moreover, the circuit court ruled that "[t]here [wa]s no reasonable likelihood that the conditions of neglect and abuse can be substantially corrected in the near future and the child needs continuity in care and caretakers, and a significant amount of time is required to be integrated into a stable and permanent home environment." Accordingly, the circuit court concluded that "[b]ased upon necessity for the welfare and best interest of the child . . . the parental rights of [Father] to [M.O.] are TERMINATED[,] and the permanent custody of the child, [M.O.,] is HEREBY committed to the Department of Health and Human Resources until further Order of the Court."

Upon entry of the dispositional order, Father filed this appeal.

## II.

## STANDARD OF REVIEW

The instant proceeding is before this Court on appeal from the circuit court's dispositional order in an abuse and neglect proceeding. Accordingly, we apply the following standard of review:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. *A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing*

12

*court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.* However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996) (emphasis added). With this standard in mind, we proceed to consider the errors assigned by Father.

## III.

## DISCUSSION

On appeal, Father raises two assignments of error. First, Father contends that the circuit court erred by terminating his improvement period despite his substantial compliance with its terms and conditions. Second, Father asserts that the circuit court erred by terminating his parental rights when he was substantially complying with the terms and conditions of his improvement period. Because Father addresses both assignments of error together, we will do so as well.

It is well-established that "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. pt. 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996). Further, we previously have held that

> [a]t the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the

13

improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.

Syl. pt. 6, *In Interest of Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991). Moreover, as we have explained, "the ultimate goal [of an improvement period] is restoration of a stable family environment, not simply meeting the requirements of the case plan." *W. Va. Dep't of Hum. Serv. v. Peggy F.*, 184 W. Va. 60, 64, 399 S.E.2d 460, 464 (1990) (per curiam). Accordingly, "[t]he question at the dispositional phase of a child abuse and neglect proceeding is not simply whether the parent has successfully completed his or her assigned tasks during the improvement period. Rather, the pivotal question is what disposition is consistent with the best interests of the child." *In re Frances J.A.S.*, 213 W. Va. 636, 646, 584 S.E.2d 492, 502 (2003) (per curiam). Similarly, "[i]n making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child." Syl. pt. 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014).

Father argues that, prior to his relapse, he was fully compliant with the terms and conditions of his improvement period. Additionally, Father contends that the only reason the abuse and neglect case was still pending in March and April of 2020 (when he relapsed) "was because [the] DHHR wanted to continue to provide services to [him] 'to ensure his success' while transitioning his son into his home"; however, he claims that those services were never provided. Furthermore, Father contends that his relapse occurred

14

during the stress of the COVID-19 global pandemic. Conversely, the DHHR asserts that despite some initial success during Father's improvement period, "he later relapsed and stopped fully participating in his improvement period." Moreover, the DHHR maintains that, after the relapse, while Father eventually began producing clean drug screens, he "continued to fail to communicate with the Department and his counsel, abandoned visits with his son, and failed to appear for his final dispositional hearing." Furthermore, the guardian ad litem maintains that "[t]aking all of the circumstances of the case into consideration, there was no error[.]" We agree with the DHHR and the guardian ad litem.

Based upon a review of the record, despite Father's initial substantial compliance with the terms and conditions of his improvement period, the circuit court found that Father was not present at the final dispositional hearing; has a very long history of substance abuse; has been in drug court, short-term treatment, and long-term treatment; after only a short period of time of M.O. being in his home, had a substance abuse relapse; and is still unable to maintain his sobriety and adequately take care of M.O. The circuit court further recognized that the COVID-19 global pandemic "had a limited effect on the case, but not substantial enough to change the result[.]" In other words, when considering the entirety of the circumstances, Father failed to sufficiently improve to justify the return of M.O. to his home. Ultimately, the circuit court concluded that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future and that the best interests of M.O. necessitate the termination of Father's parental rights.

15

The evidence offered fully supports the circuit court's findings. In the matter sub judice, there was evidence offered that Father previously had tested positive for drug use and participated in both short-term and long-term substance abuse programs. Additionally, there was evidence that Father relapsed very shortly (a little over a month) after having M.O. in his home because he said he was bored, and he continued to have positive drug screens for a period of time after M.O. was removed. Additionally, Father was late for the original dispositional hearing (only arriving after being prompted by counsel) and entirely failed to appear for the rescheduled final dispositional hearing to accommodate his initial absence (despite being present when the circuit court announced the date and time of the rescheduled hearing). Finally, Father stopped fully participating in his improvement period. Despite attending one MDT meeting and continuing to drug screen, Father stopped communicating with his counsel; had only sporadic contact with the DHHR; and, after asking once, did not actively seek visitation with his son. As this Court previously has noted, "the level of interest demonstrated by a parent in visiting his or her children while they are out of the parent's custody is a significant factor in determining the parent's potential to improve sufficiently and achieve minimum standards to parent the child." *In re Katie S.*, 198 W. Va. at 90 n.14, 479 S.E.2d at 600 n.14 (citations omitted). Consequently, given the totality of the circumstances, the circuit court was justified in concluding that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future and that the best interests of M.O. necessitate the termination of Father's parental rights.

16

Moreover, to the extent that Father argues that the circuit court erred in terminating his parental rights because he did not receive reunification services after M.O. was placed in his home on a trial basis, we reject that contention. Specifically, Father asserts that that the "reunification services which were the rationale for the delay in awarding custody to [him] were never given." As explained by Ms. Templeton during the initial dispositional hearing, from February of 2020 to April of 2020, she would, at least once a week, go to Father's home to provide assistance. Specifically, Ms. Templeton stated that she provided pre-unification services, such as safety checks, helping plan meals, and generally helping in any way needed. Father also continued to be provided drug screening. Even for a portion of time during the COVID-19 global pandemic, Father continued going to substance abuse meetings, but stopped doing so because he did not like attending meetings online.

While the DHHR has a general "duty to make reasonable efforts to reunify a family required by state or federal law[,]" West Virginia Code section 49-4-610(5) (eff. 2015),[11] during an improvement period, the parents or custodians are "responsible for the

---

[11] There are exceptions to this general rule. For example,

West Virginia Code § 49-4-602(d) (2015) specifically provides that the Department "is not required to make reasonable efforts to preserve the family if the court determines: (1) the parent has subjected the child[ren] to aggravated circumstances which include, but are not limited to, abandonment, torture, *chronic abuse* and sexual abuse." (emphasis added). This Court has found that "reasonable efforts, such as services provided by the DHHR in an improvement period, are not required if there are

17

initiation and completion of all terms of the improvement period." W. Va. Code § 49-4-610(4)(A). *See also In re Katie S.*, 198 W. Va. at 90, 479 S.E.2d at 600 ("Although the Department is required 'to make reasonable efforts to reunify a family' ([*W. Va. Code,*] 49-6-12(i) (1996)), the parents or custodians have the responsibility 'for the initiation and completion of all terms of the improvement period.' W. Va. Code 49-6-12(d) (1996).").

From review of the record, a service provider came to Father's home weekly; Father had the personal cellphone number of the services provider; and there is no evidence that Father ever inquired of the DHHR as to why he was not getting certain other services he now claims were not provided to him during this time. Accordingly, for the reasons set forth above, we affirm the circuit court's July 27, 2020 dispositional order terminating Father's parental rights to M.O.[12]

---

> aggravated circumstances[.]" *In re S. M.*, No. 11-1080, 2012 WL 2874145, at *2 (W. Va. Jan. 18, 2012)(memorandum decision)[.]

*State ex rel. W. Va. Dep't of Health & Hum. Res. v. Dyer*, 242 W. Va. 505, 520, 836 S.E.2d 472, 487 (2019).

[12] To the extent Father raises an argument that the circuit court allowed the DHHR "to de facto terminate the improvement period without any judicial oversight of all the circumstances," this issue has not been properly raised before this Court. Specifically, the entire argument for that proposition is one sentence, with no cited law, and no real analysis. However, we do acknowledge that it appears from the record before us that the DHHR removed M.O. from Father in violation of West Virginia Code section 49-4-602(c) (eff. 2015). This section provides as follows:

> (c) **Emergency removal by department during pendency of case.** – Regardless of whether the court has previously granted the department care and custody of a child, if the department takes physical custody of a child during the pendency of a child abuse and neglect case (also known as removing the child) due to a change in circumstances and without a court

# IV.

## CONCLUSION

Based upon the foregoing, the order of the Circuit Court of Wood County terminating Father's parental rights to M.O. is affirmed.

Affirmed.

---

order issued at the time of the removal, *the department must immediately notify the court and a hearing shall take place within ten days to determine if there is imminent danger to the physical well-being of the child, and there is no reasonably available alternative to removal of the child.* The court findings and order shall be consistent with subsections (a) and (b) of this section.

(Emphasis added). This notification and hearing do not seem to have occurred in this matter. It appears from the record that the DHHR spoke with the prosecutor's office regarding the removal; however, there is no indication that the prosecutor's office informed the circuit court either. During the final dispositional hearing in this case, the court intimated that this is a semi-regular occurrence with the DHHR. We wish to make clear that this Court in no way condones the DHHR's failure to comply with this statute in this matter. Nevertheless, as more fully explained herein, we still find the circuit court did not err in rendering its ruling in this case considering all the facts and circumstances before it.