**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**FILED**

**June 12, 2019**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* **A.W.**

**No.) 19-0093** (Barbour County 16-JA-75)

# MEMORANDUM DECISION

Petitioner Father J.D., by counsel A. Tyler Reseter, appeals the Circuit Court of Barbour County's December 21, 2018, order terminating his parental rights to A.W.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Allison C. Iapalucci, filed a response on behalf of the child in support of the circuit court's order. Relative foster parent intervenors C.F. and G.F., by counsel Jaymie Godwin Wilfong, also filed a response in support of the circuit court's order. On appeal, petitioner argues that (1) the DHHR was deficient in providing timely remedial services; (2) the DHHR erred in recommending the termination of petitioner's parental rights in its final case plan; (3) the DHHR failed to develop an adequate case plan as mandated by West Virginia Code §§ 49-4-604(a)(1) and (2); (4) the DHHR failed to develop a proper and timely case plan as mandated by West Virginia Code § 49-4-408(a); (5) the DHHR improperly modified petitioner's case plan in violation of West Virginia Code § 49-4-408(b); and (6) the Barbour County Prosecuting Attorney's Office improperly prosecuted the case due to a conflict of interest.[2]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2] Petitioner does not allege a specific assignment of error regarding the termination of his parental rights.

1

On November 8, 2016, the DHHR filed an abuse and neglect petition alleging that petitioner and the mother abused and neglected the child due to their substance abuse issues. Petitioner waived his preliminary hearing, and the circuit court ordered paternity testing to confirm petitioner's paternity of the child. Petitioner tested positive for methamphetamine, amphetamine, marijuana, and buprenorphine immediately following the hearing. On April 11, 2017, the circuit court entered an order noting that petitioner's adjudicatory hearing was delayed because petitioner had "not been able to take a paternity test." The circuit court further noted that the paternity test was scheduled for May 1, 2017, and that petitioner's adjudicatory hearing should be held following that testing. On May 15, 2017, the paternity test results confirmed that petitioner was the child's father.

On June 6, 2017, in anticipation of petitioner's stipulation to adjudication, the DHHR recommended that petitioner be granted a post-adjudicatory improvement period and filed a case plan outlining the terms and conditions of the improvement period, services to be provided, and goals for reunification. Thereafter, petitioner stipulated to the allegations of abuse and neglect. Specifically, he admitted that he was addicted to illegal substances and that his substance abuse impaired his ability to care for the child. Petitioner was granted a six-month post-adjudicatory improvement period. In October of 2017, the circuit court terminated the mother's parental rights and ordered that petitioner's improvement period continue. The circuit court noted that petitioner's post-adjudicatory improvement period was set to expire on December 27, 2017. In November of 2017, during an extended unsupervised visit with the child, petitioner took the child to his mother's home, where he was residing. Although a DHHR worker approved the home as an acceptable place for visits, the worker was unaware that petitioner had previously used methamphetamine in the home.

On January 4, 2018, the DHHR filed a second case plan that included petitioner's girlfriend, because the pair announced that they would be living together. The case plan noted that petitioner had not yet spoken to his doctor about titrating his Suboxone dosage, but that he planned to do so at an upcoming appointment. On January 12, 2018, the circuit court granted petitioner a second improvement period, based upon its finding that petitioner complied with his post-adjudicatory improvement period but needed additional time to titrate off his Suboxone prescription. The circuit court noted that petitioner had a pending appointment to address titration from Suboxone and that he was recently released by his doctor to begin searching for employment. Pursuant to his case plan, petitioner still needed to find employment and complete a psychological evaluation. Lastly, the circuit court noted that petitioner needed additional time to have his mother's home tested for methamphetamine contamination.

On February 20, 2018, the DHHR received a report indicating that petitioner's mother's home, where petitioner resided, was contaminated with methamphetamine residue and required abatement in order for the home to be safe for the child. According to the DHHR, petitioner took the child to the home and exposed her to the methamphetamine contamination, which was seven times the acceptable limit. He took the child to his home after he learned of the contamination. Petitioner did not complete the decontamination until August of 2018. On June 15, 2018, petitioner filed a motion to modify the case plan and asked the circuit court to remove the requirement that he titrate from Suboxone because such requirement was contrary to his doctor's

advice. However, on August 20, 2018, the DHHR filed a third case plan and stated that a goal of the case plan was for petitioner to develop a plan with his doctor to titrate from Suboxone.

On August 29, 2018, the circuit court commenced a dispositional hearing. During the hearing, petitioner offered the testimony of a physician regarding his Suboxone treatment. The physician planned to testify that petitioner should not titrate from Suboxone at that time. However, the circuit court declined to hear the testimony due to the fact that the DHHR and guardian indicated that they agreed with the recommendation that petitioner not titrate from Suboxone. Also during the hearing, the circuit court granted the child's relative foster parents intervenor status. The circuit court ordered the multidisciplinary team ("MDT") to meet and scheduled the matter for further disposition. On October 2, 2018, the DHHR filed a final case plan recommending the termination of petitioner's parental rights because the DHHR is required to seek termination of parental rights to a child who has been in foster care for at least fifteen of the last twenty-two months. The DHHR further stated in the case plan that the best interests of the child necessitated that she remain in the care of her relative foster parents, who provided her with the only home she has ever known.

On October 11, 2018, the circuit court held a final dispositional hearing in the matter. The DHHR, the guardian, and the relative foster parent intervenors requested the termination of petitioner's parental rights. All three requests were based upon the best interests of the child. Notably, the parties stated that the child had spent the majority of her life in the relative foster parents' home and had a bond with them, but also developed attachment issues due to visits with petitioner. However, the parties supported continued contact with petitioner consistent with the child's best interests.

The child's relative foster parents testified regarding their bond with the child and the attachment issues the child developed as a result of visitation with petitioner. The DHHR also presented testimony regarding the child's visits with petitioner. Specifically, a service provider testified that the child was upset and crying during exchanges on multiple occasions. The service provider also testified regarding the frequency and length of petitioner's visits during the proceedings. Petitioner commenced visitation with the child in December of 2016, with visits of two hours per week. Once paternity was established, petitioner's visits were increased to two visits per week for two hours each. Further, the service provider testified that petitioner agreed to titrate from Suboxone in November of 2016. She also testified that some delays in the matter occurred due to petitioner's request to include his girlfriend in his case plan. Petitioner requested to live with his girlfriend, but the DHHR advised that it was not in the child's best interests due to the girlfriend's own Child Protective Services case. The service worker further explained that petitioner "was constantly asking that other people be involved in his case, to include grandparents, great-grandparents, his own siblings and extended family, which the DHHR had to limit, due to the [child's] young age." The service worker agreed that petitioner obtained gainful employment during the proceedings, but failed to obtain stable housing.

Next, petitioner testified on his own behalf. He admitted that he failed his drug screen following the preliminary hearing and that he was initially dishonest with the circuit court regarding his substance abuse. He then testified regarding the methamphetamine contamination in his mother's home and claimed that he was unaware that his prior methamphetamine use

3

could affect the home. He testified that he paid for the home to be abated in August of 2018; however, he no longer wished to live with his mother in that home and wanted to live with his girlfriend. Petitioner acknowledged that his methamphetamine use negatively impacted the child and admitted that he was charged with driving on a suspended license during the proceedings. When questioned about the child's best interests, petitioner responded that he loves his child, but that he did not want to keep the child from the relative foster parents. Petitioner also acknowledged that he cancelled visits with the child on more than one occasion.

In its dispositional order, the circuit court noted that "at no time did [petitioner] object to any of the terms or conditions of his improvement period, and he agreed, initially, to titrate from Suboxone." The circuit court also noted that petitioner failed to maintain stable housing "for the duration of this case." Further, the circuit court noted that the child had been in foster care with her relatives for twenty-three months and they were the only parents the child had ever known. Removing the child from their care was contrary to her welfare. Moreover, the circuit court explained that

> it has no issue with [petitioner] or his [S]uboxone titration and that's not what this case is about. The individuals who provided documentation are experts and the [c]ourt takes their opinion as authority. Again, the primary issue is whether or not the removal is contrary to the best interests of the child.

Further, the circuit court found that

> [n]o one in this case, even [petitioner] believes that removal of [the child] from the home of the [relative foster parents] to be in her best interests. These two people . . . are her parents and she absolutely should not be removed as these are the only parents she has ever known . . . This child needs permanency and stability and she feels safe with [the relative foster parents].

Additionally, the circuit court found that petitioner knowingly took the child to his mother's home before it was abated and that he was aware of the danger to the child. The circuit court also found that petitioner "changed his mind on the issue of titration, which is fine, but time marched on for this little child. Remediation was undertaken with regard to the methamphetamine contamination in [petitioner's] home, and still, time marched on and its for all these reasons that the [circuit c]ourt makes its decision." Ultimately, the circuit court found that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect in the near future and that the child's welfare necessitated the termination of petitioner's parental rights. The circuit court terminated petitioner's parental rights in its December 21, 2018, order.[3] It is from this order that petitioner appeals.

The Court has previously established the following standard of review:

---

[3]The mother's parental rights were also terminated. According to respondents, the permanency plan for the child is adoption in her relative foster placement.

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). Upon our review, this Court finds no error in the proceedings below.

On appeal, petitioner first argues that the DHHR was "deficient in providing timely remedial services . . . that resulted in an unreasonable delay in the completion of the terms and/or conditions" of petitioner's improvement periods. We disagree. West Virginia Code § 49-4-610(4)(A) provides that parents that are granted improvement periods "shall be responsible for the initiation and completion of all terms of the improvement period." According to petitioner, he "did everything the [DHHR] asked of him by attending MDT meetings, completing parenting and adult life skills classes, attending nearly all his visits with the child, obtaining a job, and acquiring stable housing." It is uncontested that petitioner substantially complied with the terms and conditions of his improvement period. However, the record does not support petitioner's assertion that the DHHR caused unreasonable delays that ultimately led to the termination of his parental rights. In fact, the record shows that petitioner repeatedly made representations to the MDT that he was in need of more time to address the requirements of his improvement period.

In support of his argument that the DHHR failed to provide timely remedial services, petitioner avers that he was prejudiced by the delay of his paternity testing. On November 18, 2016, the circuit court ordered that a paternity test be "set up as soon as it possibly can be." However, the order from the November 18, 2016, hearing was not entered until March 3, 2017, and the results of the test were not returned until May 15, 2017. Petitioner contends that the DHHR "was the sole entity responsible for completing the test." However, petitioner's contention is not supported by the record. On April 10, 2017, the circuit court issued an order stating that petitioner "has not been able to take a paternity test." There was no mention in the order of any delay caused by the DHHR. However, despite the delay in paternity testing, petitioner was afforded visitation with the child in December of 2016, the month following the preliminary hearing. Further, petitioner was afforded additional visitation time with the child before his paternity was confirmed. Moreover, there is no evidence that the delay of paternity testing contributed to the subsequent termination of petitioner's parental rights. Therefore, petitioner is entitled to no relief.

5

Also in support of his argument that the DHHR failed to provide timely remedial services, petitioner argues that the DHHR "never defined stable housing to include that the home be free from all contaminants." According to petitioner, if he had known that he may need to remediate the methamphetamine contamination in his mother's home, "he would have completed remediation at the earliest date possible following knowledge that remediation was necessary." Petitioner also admits that he took the child to the home before remediation, but that the DHHR approved the home for visit. Petitioner contends that the DHHR "must bear equal, if not greater, responsibility" than petitioner. Petitioner also blames the DHHR for the delay in testing for methamphetamine contamination at his mother's home. Again, petitioner's assertions are not supported by the record. While petitioner blames the DHHR for not adding a specific requirement to his case plan that a methamphetamine contaminated home would not constitute a suitable home for the child, petitioner ignores the fact that once he learned that the house was contaminated and, therefore, inappropriate, he did not remediate the methamphetamine contamination for six months. Petitioner also argues that his requests for more frequent visitation with the child were denied. However, petitioner fails to acknowledge that the methamphetamine contamination left him without a suitable home for extended visitation and that he was afforded overnight visits with the child after the contamination was remediated. Thus, petitioner is entitled to no relief in regard to this issue.

Further in support of his argument that the DHHR was untimely in providing services, petitioner argues that he was prejudiced by the delay of the psychological evaluation. The evaluation was conducted on February 15, 2018, March 28, 2018, and April 5, 2018, and was completed ten months after he was initially granted an improvement period. Petitioner also argues that the DHHR's "mis-management in scheduling [healthy relationships] classes recommended as part of his treatment plan caused unreasonable and untimely delay which directly led to the termination of [his] parental rights." The record is unclear as to why the psychological evaluation and healthy relationships classes were delayed. However, the record indicates that petitioner completed both requirements and that the delays were not dispositive of the termination of his parental rights. As such, petitioner is not entitled to relief.

Lastly, in support of his argument that the DHHR failed to provide timely remedial services, petitioner asserts that the DHHR's addition of the requirement that he "be free of all substances" was contrary to medical advice. Petitioner alleges that the DHHR continued to require the titration condition against sound medical advice for a year, thereby denying petitioner adequate visitation increases. However, he admits that the circuit court recognized that titration from Suboxone was not an issue at disposition and that the circuit court never ruled that titration was a requirement of his improvement period. In regard to this issue, the record shows that petitioner initially was in agreement to titrate from Suboxone and made representations to the MDT that he and his doctors were working to create a titration plan. Despite a letter from his doctor in June of 2017 that advised against titration, petitioner still represented to the MDT during a meeting in January of 2018 that he planned to titrate. Further, the notes from the February 5, 2018, MDT meeting indicate that petitioner "worked out a titration schedule" with his doctor whereby he would decrease his dosage by two milligrams each month. Even at the dispositional hearing, when asked if he previously planned to titrate from Suboxone, petitioner answered, "Yeah. I had every intention to." However, at some point, petitioner changed his mind about titration and his attorney was directed to file a motion to alter the case plan to remove the

6

requirement, which she failed to do until June of 2018. By the time of the first dispositional hearing in August of 2018, the parties were in agreement that, pursuant to medical advice, petitioner should not be required to titrate from Suboxone. Moreover, the circuit court made clear in its dispositional order that petitioner's lack of titration from Suboxone was not a factor in its decision to terminate petitioner's parental rights. The circuit court specifically found that petitioner "changed his mind on the issue of titration, which is fine, but time marched on for this little child." Because petitioner's lack of titration from Suboxone was not a factor in the circuit court's decision to terminate petitioner's parental rights, petitioner is entitled to no relief regarding this issue.

Next, petitioner argues that the DHHR erroneously recommended termination of his parental rights in its final case plan. Petitioner is entitled to no relief, however, because the DHHR was required to move for termination of his parental rights due to the fact that the child had been in foster care for fifteen of the most recent twenty-two months, which petitioner acknowledges. According to West Virginia Code § 49-4-605(a)(1), the DHHR is required to move for the termination of a parent's parental rights when "a child has been in foster care for [fifteen] of the most recent [twenty-two] months." Further, we have held that "[i]n making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child." Syl. Pt. 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014). Unfortunately, despite his compliance with services, the termination of petitioner's parental rights was necessary for the child's welfare. Evidence was presented at the dispositional hearing that the child had resided in her relative foster care placement for twenty-three months, nearly her entire life. The foster parents and service providers testified regarding the foster parents' bond with the child as well as attachment issues the child developed after increased visitation with petitioner. According to the testimony, the child displayed signs of stress and anxiety due to her separation from her foster parents. Both the foster parents and service providers testified that the child was upset and crying during exchanges on multiple occasions. The foster parents also testified that they believed petitioner and the child had a bond, but that the child viewed petitioner as a playmate rather than a parent. Moreover, during the dispositional hearing, petitioner testified that, although he wanted to continue a relationship with the child, the child's best interests were served by remaining in the care of the foster parents. Based on this evidence, it is clear that the DHHR was required to move for the termination of petitioner's parental rights and that termination was necessary for the child's welfare.

Further, petitioner argues that the DHHR did not develop an adequate case plan as mandated by West Virginia Code §§ 49-4-604(a)(1) and (2).[4] Petitioner alleges that the DHHR

---

[4]West Virginia Code 49-4-604(a) provides, in relevant part, as follows:

(1) A description of the type of home or institution in which the child is to be placed, including a discussion of the appropriateness of the placement and how the agency which is responsible for the child plans to assure that the child receives

(continued . . . )

7

failed to include "any of the mandated information in the initial case plan" and that the initial case plan was "virtually blank and [did] not provide reasonable guidance" to petitioner. Petitioner avers that none of the case plans documented efforts to ensure that the child was returned home within the approximate time lines for reunification as set out in the plan. Petitioner further contends that the DHHR failed to provide petitioner "reasonable accommodations in accordance with the Americans with Disabilities Act" ("ADA"). Petitioner argues that the "law is well settled that people with opioid addiction, including those who receive treatment with medications such as methadone, buprenmorphine, or naltrexone, are individuals with a 'disability' under the ADA."[5] However, the record shows that petitioner and his attorney participated in the formulation of the case plans through the MDT process. Other than his June 2018 motion in objection to the condition of titration, there is no record of any objection by petitioner to any of the case plans that he now claims were inadequate. "'Our general rule is that nonjurisdictional questions . . . raised for the first time on appeal, will not be considered.' *Shaffer v. Acme Limestone Co., Inc.*, 206 W.Va. 333, 349 n.20, 524 S.E.2d 688, 704 n.20 (1999)." *Noble v. W. Va. Dep't of Motor Vehicles*, 223 W. Va. 818, 821, 679 S.E.2d 650, 653 (2009). Therefore, this argument will not be considered on appeal.

Petitioner next argues that the DHHR failed to develop a proper and timely case plan as required by West Virginia Code § 49-4-408(a) which provides that "[t]he case plan must be filed within sixty days of the child coming into foster care or within thirty days of the inception of the improvement period, whichever occurs first." The child was placed in foster care in November of 2016; however, petitioner's paternity was not confirmed until May of 2017. After the circuit court found that petitioner was the child's father, the DHHR filed a case plan within a week of when the circuit court granted him a post-adjudicatory improvement period in June of 2017. Although petitioner alleges that this "deficiency [by the DHHR] was a factor in the termination" of petitioner's parental rights, we find that petitioner was not prejudiced by the DHHR's filing of a case plan within a week of the commencement of his post-adjudicatory improvement period,

---

proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions that made the child unsafe in the care of his or her parent(s), including any reasonable accommodations in accordance with the Americans with Disabilities Act of 1990, 42 U. S. C. § 12101, et seq., to parents with disabilities in order to allow them meaningful access to reunification and family preservation services; (2) A plan to facilitate the return of the child to his or her own home or the concurrent permanent placement of the child; and address the needs of the child while in relative or foster care, including a discussion of the appropriateness of the services that have been provided to the child. . . . The plan must document efforts to ensure that the child is returned home within approximate time lines for reunification as set out in the plan.

[5]Petitioner fails to provide any legal authority in support of this argument in violation of Rule 10(c)(7) of the West Virginia Rules of Appellate procedure, which provides that "[t]he brief must contain an argument exhibiting clearly the points of fact and law presented, the standard of review applicable, and citing the authorities relied on."

especially when he was afforded services and visitation with the child prior to the filing of the case plan. Therefore, petitioner is entitled to no relief in regard to this argument.

Petitioner also argues that the DHHR improperly modified petitioner's case plan in violation of West Virginia Code § 49-4-408(b) which provides, in relevant part, that "[t]he case plan may be modified from time to time to allow for flexibility in goal development, and in each case the modifications shall be submitted to the court in writing." In support, petitioner contends that the DHHR modified the case plan not to allow for flexibility and goal development, but to add "more onerous and rigid conditions, that were not agreed upon by all [MDT] members, and that ran counter to sound medical advice." Petitioner fails to acknowledge that during the dispositional hearing, he testified that "it was agreed and put into the case plan that I was to be taken off Suboxone." As discussed above, petitioner initially agreed to titrate from Suboxone and later changed his mind about the requirement. Petitioner's attorney filed a motion to remove the titration requirement from the case plan in June of 2018, and by August of 2018, the parties were in agreement that, based upon the opinions of petitioner's physicians, petitioner should not be required to titrate from Suboxone. Moreover, as discussed above, petitioner's decision to not titrate from Suboxone was not a factor in the circuit court's decision to terminate petitioner's parental rights. Thus, petitioner is not entitled to any relief regarding the DHHR's modification of the case plan.

Finally, petitioner argues that the Barbour County Prosecuting Attorney's office improperly prosecuted the matter due to a conflict of interest. However, the circuit court entered an order on March 3, 2017, finding that the prosecuting attorney "has no conflicts with these matters and would be able to prosecute the matters." The circuit court included a list of case numbers, which included the instant matter. Petitioner fails to cite to any portion of the record to indicate that he objected to any potential conflict of interest involving the prosecutor's office during the proceedings below. Therefore, this argument will not be considered on appeal. *See Noble*, 223 W. Va. at 821, 679 S.E.2d at 653.

For the foregoing reasons, we find no error in the decision of the circuit court, and its December 21, 2018, dispositional order is hereby affirmed.

Affirmed.

**ISSUED**: June 12, 2019

**CONCURRED IN BY**:

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchison