STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS

FILED
April 20, 2021

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* **H.P.**

**No. 20-0834** (Webster County 19-JA-6)


# MEMORANDUM DECISION


Petitioner Father D.P., by counsel Steven B. Nanners, appeals the Circuit Court of Webster County's September 15, 2020, order terminating his custodial rights to H.P.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel S.L. Evans, filed a response in support of the circuit court's order. The guardian ad litem, Mary Elizabeth Snead, filed a response on behalf of the child also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating his custodial rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

The DHHR filed a child abuse and neglect petition against petitioner and his wife in March of 2019. The DHHR indicated that the child's biological parents' parental rights were terminated in 2013 and that petitioner and his wife, the maternal grandparents, adopted the child shortly thereafter.[2] At the time of the adoption, the circuit court ordered petitioner and his wife to prohibit any direct or indirect contact between the biological parents and the child. However, in February of 2019, the child informed a Child Protective Services ("CPS") worker that his biological mother had been residing in the home with him. The CPS worker interviewed petitioner, who claimed that the biological mother was sick and questioned "what else could he do?" Petitioner threatened to

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2]The record indicates that the child has been diagnosed with autism and is significantly developmentally delayed.

kill the CPS worker if he attempted to remove the child from the home, and his wife threatened that they would take the child out of school and go "somewhere that the WV DHHR could not find him." The DHHR informed the child's school that petitioner and his wife were not permitted to pick up the child from school, but petitioner and his wife retrieved the child, and the DHHR reported that their whereabouts were unknown at the time of the petition's filing. The DHHR concluded that petitioner failed to provide a fit and suitable home by allowing the child's biological mother to live in the home with the child and that he failed to protect the child from the biological mother.

The circuit court held a preliminary hearing in March of 2019. CPS workers testified about responding to petitioner's home following reports that the child's biological mother was living in the home. One CPS worker testified that when petitioner was confronted with the allegations, he became irate and initially denied that the biological mother was living in the home but later admitted that she was in the home. Petitioner also threatened to shoot the worker if she attempted to remove the child from the home. Another CPS worker testified that law enforcement officers responded to the home and found the biological mother inside. Following testimony, the circuit court found that imminent danger existed and continued custody of the child with the DHHR.

In April of 2019, the circuit court held an adjudicatory hearing. The circuit court took judicial notice of evidence presented at the preliminary hearing, as well as during the prior proceedings in which the biological parents' parental rights were terminated. The DHHR also presented the testimony of a teacher and the principal of the child's school, both of whom testified to the child's absences and the instance wherein petitioner's wife removed the child from school after the CPS workers' visit to the home. Following testimony, the circuit court adjudicated petitioner as an abusing parent. The circuit court found that it previously prohibited contact between the biological parents and the child, and that petitioner permitted contact to occur. The circuit court further found that petitioner educationally neglected the child by permitting him to have seventy-three absences from school. The circuit court found, "[a]lthough the legislature has expanded what is considered an excused absence, the child still has 17 unexcused absences." Lastly, the circuit court found that petitioner did not testify and, accordingly, "impose[d] an adverse inference."

In December of 2019, the circuit court held an initial dispositional hearing. Barbara Nelson, a licensed psychologist at Saar Psychological group, testified regarding her evaluation of petitioner. During the evaluation, petitioner denied threatening a CPS worker who visited the home but admitted he cursed at the worker. Petitioner became agitated during the interview while speaking about CPS and denied that he let the biological mother have contact with the child. However, petitioner also stated, "I didn't throw her out in the road. She still needs help." During the evaluation, petitioner also denied that he permitted the child to stay home from school. Ms. Nelson pointed out that the child had in excess of seventy days missed and that it seemed unlikely he would be ill to that extent, but petitioner claimed that the child had only five unexcused absences. Ms. Nelson testified that petitioner failed to accept responsibility for any allegations contained in the petition and further opined that her prognosis for petitioner was extremely poor. She stated, "I find that there's almost no reason to believe he would comply with any court order or CPS requirement, as he has not done so in the past. And certainly he's denied any responsibility for what was going on. And without acceptance of responsibility, there's no motivation to change."

Ms. Nelson further testified that there was no reason to believe that any services would be beneficial to petitioner.

Dr. Megan Green, an independent forensic psychologist from Hudson Forensic Psychology obtained by petitioner following Ms. Nelson's evaluation, also testified regarding her evaluation of petitioner. Dr. Green opined that petitioner's motivation for treatment was poor and that he perceived little need for behavioral change. Petitioner minimized the child's involvement with the biological mother. During the evaluation, petitioner acknowledged that he disobeyed a court order by allowing the contact and behaved in a verbally aggressive manner in his interactions with CPS. However, he did not acknowledge other referral concerns, such as issues with truancy. Dr. Green's report indicated that petitioner's prognosis for attaining minimally adequate parenting was poor, "largely due to history of educational neglect, exposure of his grandson to circumstances that would foreseeably result in harm, failure to acknowledge referral concerns, his adversarial stance in interactions with CPS and failure to comply with specific court order, history of alcohol abuse, and likely minimization of the same." Accordingly, Dr. Green testified that she agreed with Ms. Nelson's assessment.

A CPS worker testified that petitioner was receiving services such as parenting classes, counseling, and random drug screening. However, the CPS worker testified that during her interactions with petitioner, he minimized the contact between the child and the biological mother. The worker reported that petitioner became upset, emotional, and mad during his visits with the child and threatened to "storm off." The worker testified that the DHHR was recommending termination of petitioner's parental rights. Following this testimony, the circuit court continued the hearing.

The circuit court reconvened the dispositional hearing in January of 2020. Petitioner requested an improvement period. A service provider testified that petitioner and the child had a "very loving bond" and that the child consistently stated he wanted to go home with petitioner and his wife. However, the service provider also testified that she frequently had to redirect petitioner and remind him not to talk about the case during visits with the child. A CPS worker testified that petitioner was compliant with services and submitted to drug screens, which were negative. The CPS worker opined that petitioner's participation in services had not "changed [his] understanding . . . of what [he has] done wrong in this case."

Petitioner testified that he was willing to comply with the terms and conditions of an improvement period. Petitioner testified that he would keep the child away from the biological mother, that he and the child shared a strong bond, and that he had been fully complying with services thus far. Following testimony, the circuit court found that there was sufficient evidence to terminate petitioner's parental rights. The court found that petitioner violated the court's order by permitting the child around the mother and testified falsely. The circuit court further found that petitioner blamed "everybody else . . . as to what other people should've done in this case." Nevertheless, the circuit court found that the child had an "extreme bond" with petitioner, and the circuit court granted petitioner an improvement period, the terms of which required that petitioner have no contact with the biological mother, have no one in his residence or in the presence of the child that has a felony conviction or any drug-related conviction, continue attending counseling sessions, submit to drug and alcohol screens, participate in supervised visitation, and maintain a

3

fit and suitable home because "the conditions of the home was an issue in this case, and they must maintain a suitable home."

A review hearing was held in May of 2020. A CPS worker testified that petitioner was participating in services and had not submitted a single positive drug or alcohol screen. The CPS worker testified that petitioner was working on the home because "[t]he house had some issues, weak floors, some mold issues, and some cleanliness issues that [he is] working on." In August of 2020, the circuit court held a second review hearing. A CPS worker testified that petitioner was compliant with services. The CPS worker stated that petitioner was participating in parenting classes, submitting to drug screens, attending supervised visitations, and participating in therapy. The CPS worker testified that petitioner "made a couple of improvements" to the home, including fixing "the ceiling where it was falling in, and [he] fixed the floor." However, petitioner needed to improve the cleanliness of the home. The worker testified that the "whole yard has hazards in it" and that the home was extremely cluttered with trash and dirty dishes scattered throughout. The CPS worker opined that it was not fit and suitable for the child at that time. Accordingly, the CPS worker recommended termination of petitioner's parental rights, and the circuit court set the matter for disposition.

The final dispositional hearing was held later in August of 2020. A service provider testified that petitioner was compliant with parenting classes and was setting boundaries with the biological mother. For example, the biological mother stole petitioner's car in May of 2020, and he filed charges against her. Regarding the condition of the home, the service provider testified that "there are days that it is better than others," but that on the bad days "it's more to the extreme of being bad." She explained that there were dangers in the front yard that could hurt the child, including "junk cars" and rusty items with nails. The provider conceded that she recently visited the home and that it was in the best condition it had been in during the proceedings and that there were no safety issues for the child inside the home. The service provider also testified that she was concerned about petitioner's ability to keep up with the child's education as he put little effort into bringing requested items, such as educational worksheets, to the visits. Another service provider testified that the visits went well and that the child enjoyed them.

A CPS worker testified that petitioner had contact with the biological mother in May of 2020 when he drove her to the hospital to be admitted based on her drug abuse. The worker also testified that petitioner and his wife had difficulty maintaining a suitable home and that, while the conditions of the home had improved, there were still issues with the suitability of the home. The worker testified that petitioner kept cars in his yard that were precariously held up by blocks, which presented a danger to the child. The worker also testified regarding the strides the child made academically after being removed from petitioner's home. At the time of the petition's filing, the child was unable to read simple, age appropriate books. However, due to the foster parents' efforts, the child was able to read a portion of a book to the worker during her last visit with the child. Based on those issues, the DHHR recommended termination of petitioner's parental rights.

Petitioner testified that he had cars and other equipment in his yard but that it did not prevent anyone from entering the home. He stated, "it's a hobby and I make money on it." Petitioner denied that any of the vehicles were on blocks or in precarious positions. Petitioner testified that he had a sawmill, a bandsaw mill, dozers, and loaders, and that he was teaching the

4

child to work with them. Petitioner further testified that he made all necessary repairs to the home. He claimed that he "tore the floors out in one room that had a weak floor . . . and replaced all of it, replaced the bed, replaced the floor, replaced the insulation, I put new flooring under it. Done the bathroom, done everything that [the CPS worker] had on that list." Petitioner admitted to taking the biological mother to the hospital for help with her drug addiction. However, petitioner stated that he dropped her off and told her he could not help her and further pressed charges against her after she stole his car a few days later.

The circuit court noted that it had sufficient evidence to terminate petitioner's parental rights at the January of 2020 dispositional hearing but refrained from doing so due to the child's extreme bond with petitioner. Testimony at the final dispositional hearing established that petitioner had contact with the biological mother; however, the circuit court said, "I can't overlook the fact that that is [his] daughter under those circumstances. And although there is that technical violation, that in and of itself does not cause me to terminate the rights in this case." Rather, the circuit court explained "when I look at the photographs which have [been] introduced here today, there's no question in my mind that the home is not fit, apt and suitable for this child." The circuit court also expressed concern over petitioner's testimony regarding the dangerous activities he permitted the child to engage in while in his care given the special needs of the child. The circuit court noted that the child had achieved academically since having been removed from the home and responded well in his placement.

The circuit court concluded that petitioner failed to successfully complete his improvement period. Due to the child's bond with petitioner, the circuit court terminated only his custodial rights to the child upon finding that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse or neglect in the foreseeable future and that termination of his custodial rights was in the best interest of the child. Petitioner appeals the September 15, 2020, dispositional order.[3]

The Court has previously established the following standard of review in cases such as this:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

---

[3]The adoptive mother's custodial rights were terminated during the proceedings below. The child was placed in the care of foster parents, and the permanency plan for the child is guardianship with the foster parents.

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in concluding that he failed to successfully complete his improvement period and in terminating his custodial rights based upon the same. Petitioner contends that he complied with and completed the terms and conditions of his improvement period by refraining from being in the presence of any substance abuser or anyone with a criminal or CPS history, by attending counseling, by refraining from discussing the case with the child during visits, and by maintaining a fit and suitable home. With regard to the condition of the home, petitioner argues that the vehicles in his yard are not a danger to the child and, in fact, are an educational benefit to him. Petitioner avers that there is a difference between filth and clutter and that the evidence regarding the condition of his home did not rise to the level of demonstrating it was unfit. Further, he admits that while he had contact with the biological mother in violation of the terms of his improvement period, it was only to drive her to the hospital, and the circuit court found that this technical violation "in and of itself does not cause the [c]ourt to terminate the rights in this case."

This Court has held that

> [a]t the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.

Syl. Pt. 6, *In re Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991). Further, "[i]n making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child." Syl. Pt. 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014); *see also In re Frances J.A.S.*, 213 W. Va. 636, 646, 584 S.E.2d 492, 502 (2003) ("The question at the dispositional phase of a child abuse and neglect proceeding is not simply whether the parent has successfully completed his or her assigned tasks during the improvement period. Rather, the pivotal question is what disposition is consistent with the best interests of the child."). Lastly, we note that West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate parental rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the child's welfare. West Virginia Code § 49-4-604(d) provides that a circuit court may find that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected when the abusing parent has "demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help."

In this case, the circuit court did not err in finding that petitioner failed to successfully complete his improvement period. Although petitioner complied with parenting and adult life skills classes, completed therapy, and adequately participated in supervised visits with the child, he failed to demonstrate that he adequately addressed the suitability of his home. In particular,

petitioner made no attempt to rid his yard of hazardous debris and cars which posed a danger to the child given his special needs. Additionally, while both the service provider and the CPS worker conceded that petitioner's home was in decent condition in the days leading to the final dispositional hearing, testimony established that the home's cleanliness was inconsistent and that when the home was not clean, it was "more to the extreme of being bad." Indeed, the circuit court stated that in viewing the photographs of petitioner's home, there was "no question" that the home was not suitable for the child.

It is also evident that the petitioner failed to acknowledge the extent that he allowed the biological mother in the home with the child and that he was at continued risk of putting the child in harm's way. While petitioner is correct that the circuit court did not terminate his custodial rights solely based on his "technical violation" of contacting the biological mother during the improvement period, the circuit court nevertheless properly considered this contact in rendering its decision. Further, the testimony of Ms. Nelson and Dr. Green established that petitioner's prognosis for attaining minimally adequate parenting was poor and that he minimized the extent of his actions. Petitioner failed to recognize issues with the child's truancy and, as of the final dispositional hearing, the testimony established that the child consistently attended school during the school year while in placement with the foster family. The CPS worker and service provider also testified that the child was doing very well in the foster parents' home and had improved academically.

In sum, while petitioner made some changes in order to comply with the requirements of his improvement period, he did not modify his behavior or make sufficient improvement to justify the return of the child to the home. "We have recognized that it is possible for an individual to show compliance with specific aspects of the case plan while failing to improve . . . [the] overall attitude and approach to parenting." *In re B.H.*, 233 W. Va. at 65, 754 S.E.2d at 751 (additional quotations and citations omitted). Such is the case here. While petitioner completed some aspects of his improvement period, "courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened[.]" Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980). To the extent that petitioner argues that a less-restrictive alternative disposition should have been imposed given the child's extreme bond with him, we note that the circuit court terminated only his custodial rights, leaving his parental rights intact. Despite petitioner's participation in an improvement period and his completion of certain requirements, we find that sufficient evidence existed to support the circuit court's finding that there was no reasonable likelihood that petitioner could correct the conditions of abuse and neglect in the near future and that termination was in the child's best interests. Accordingly, for the reasons set forth above, we find no error in the circuit court's termination of petitioner's custodial rights to the child.

For the foregoing reasons, we find no error in the decision of the circuit court, and its September 15, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**: April 20, 2021

7

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton