**STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS**

*In re* A.C.

No. 21-0368 (Harrison County 20-JA-38-1)

**MEMORANDUM DECISION**

Petitioner Mother L.C., by counsel Jenna L. Robey, appeals the Circuit Court of Harrison County's April 22, 2021, order terminating her parental rights to A.C.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and James Wegman, filed a response in support of the circuit court's order. The guardian ad litem, Allison McClure, filed a response on behalf of the child in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in denying her motion for a post-dispositional improvement period and terminating her parental rights without imposing a less-restrictive alternative disposition.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In February of 2020, the DHHR filed a child abuse and neglect petition after petitioner gave birth to drug-exposed A.C., who was also born premature. Petitioner denied drug use despite the child's umbilical cord blood returning a positive result for codeine, an opioid. Notably, petitioner had no valid prescription for the codeine. Additionally, the DHHR alleged that petitioner was homeless. Due to her prematurity, A.C. stayed in the Neonatal Intensive Care Unit for about a month, was placed on a breathing machine, and required a feeding tube. Thereafter, petitioner waived her preliminary hearing.

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

The circuit court granted petitioner a preadjudicatory improvement period by agreed order in March of 2020. The terms of the improvement period required petitioner to undergo a parental fitness and psychological evaluation, attend parenting classes and counseling sessions, obtain suitable housing and income, and attend all supervised visitations with A.C. On July 7, 2020, the DHHR filed an amended petition alleging that petitioner failed to complete the terms of her preadjudicatory improvement period as she remained homeless, failed to submit to drug screens, and failed to complete parenting classes. The DHHR also alleged that petitioner had been hospitalized for mental health issues for a total of twenty days during the improvement period.

Petitioner completed her parental fitness and psychological evaluation on July 9, 2020, with Dr. Edward Baker. During the evaluation, petitioner denied all drug use and could not explain why A.C. was born with opioids in her system. Petitioner also denied all mental health issues, blaming her psychological issues on the DHHR's removal of the child from her care. Petitioner stated that she did not trust the foster mother, alleging that the foster parent wanted to keep A.C. because she could not have her own children. Petitioner stated that she offered to be a surrogate to the foster mother if she "still has eggs that are good" but that the foster mother could not keep A.C. Petitioner explained that she left the local homeless shelter because her roommate was harassing her and she admitted herself to a hospital to "get away" from the roommate by claiming she was suicidal. She later admitted to lying about being suicidal to "get help." Petitioner's history of housing was confusing and unclear, but she blamed an ex-boyfriend, her sister, and a Department of Housing and Urban Development worker for making her homeless while pregnant with A.C. Likewise, petitioner's explanation of her mental health history was unclear, as she stated that she had been diagnosed with depression and bipolar disorder but added that she was hospitalized twice as a teenager for obsessive compulsive disorder. She also denied symptoms of depression. Petitioner disclosed that she was charged with animal cruelty in 2014 after two cats died in her abandoned home but blamed an ex-boyfriend for this. She also stated that she planned to "give" A.C. to her sister prior to the DHHR removing the child from petitioner's care. In Dr. Baker's opinion, some of petitioner's ideas and beliefs bordered on delusional, as she felt that others were going to harm her. Dr. Baker diagnosed petitioner with unspecified personality disorder, with borderline paranoid and obsessive-compulsive traits. Dr. Baker concluded that petitioner needed to participate in therapy and medication management, and lacked the parental capacity to care for and protect newborn A.C.

In late July of 2020, the circuit court held an adjudicatory hearing. Petitioner did not contest that she failed to complete her preadjudicatory improvement period and admitted to having lived in four different locations since February of 2020, missing drug screens, and being hospitalized three times for mental health problems. The DHHR presented evidence of the results from petitioner's parental fitness and psychological evaluation. The court found that petitioner failed to successfully complete her preadjudicatory improvement period, lacked stable housing for the child, and had significant mental health issues that needed to be addressed. Having heard the evidence, the court adjudicated petitioner as an abusing parent. However, the circuit court granted petitioner a post-adjudicatory improvement period in August of 2020, the terms of which were the same as petitioner's prior improvement period.

Petitioner underwent a second parental fitness and psychological evaluation on March 11, 2021, with Dr. Baker. Petitioner reported that she was angry that the DHHR placed A.C. with the

child's nonabusing father. She stated that he had cheated on her with another woman, the father's girlfriend. Petitioner stated that she obtained a stable income through social security disability benefits. Dr. Baker noted the lack of drug testing results and was unable to assess petitioner's substance abuse issues. In the evaluation report, Dr. Baker included information regarding A.C.'s heart surgery that took place in February of 2020. According to nurses at the hospital, petitioner repeatedly called the unit and demanded to speak to the father. The nurses reported that petitioner was angry and threatened to stab both the father and his girlfriend, as well as "blow up" the hospital. During the interview, Dr. Baker noted that petitioner's mood had improved with her medication but still opined that petitioner exhibited concerning personality traits such as impulsivity, poor judgment, and acting out of anger. She also blamed others for many of her problems and behaved irresponsibly when handling everyday situations. Dr. Baker found that petitioner appeared to be more insightful into her difficulties and was attempting to address some of her problems. However, Dr. Baker concluded that petitioner lacked the parental capacity to safely care for and protect A.C.

In April of 2021, petitioner filed a motion for a post-dispositional improvement period, and the DHHR filed a summary recommending the termination of petitioner's parental rights. The same month, the circuit court held a contested final dispositional hearing. First, the DHHR presented the testimony of Dr. Baker, who explained the results of petitioner's two parental fitness and psychological evaluations—the first in July of 2020 and the second in March of 2021. Dr. Baker testified consistently with the evaluations and stated that the results of both evaluations were similar in that petitioner exhibited personality traits that impacted her judgment. He explained that petitioner switched therapists because she did not get along with the first one and that persons with personality disorders often go through multiple therapists, shopping for ones that tell them what they want to hear. He stated that petitioner portrayed extreme anger with the father. Dr. Baker concluded that petitioner's personality characteristics impeded her ability to safely parent A.C. and did not believe that petitioner's issues could be corrected with therapy and treatment within six months, as petitioner suffered from a severe personality disorder that normally takes years to address.

Next, the DHHR provider testified regarding petitioner's progress with supervised visitations. She explained that petitioner's in-person visits were suspended after petitioner threatened to stab the father and his girlfriend and blow up the hospital. Petitioner told the provider that the father had provoked her because he kept hanging up on her due to his girlfriend's presence. During some in-person visits petitioner remained focused on the father's relationship with another woman and stated that if she had A.C. returned to her, she would never let them see the child again. However, the provider stated that she was never afraid of petitioner, that petitioner appeared bonded with the child, and otherwise acted appropriately. The second DHHR provider testified as to petitioner's participation in parenting and adult life skills classes. She stated that she began providing weekly sessions in July of 2020, but soon thereafter lost contact with petitioner as she moved around from place to place. She reinstated sessions in October of 2020 and petitioner initially did well. However, by December of 2020, petitioner became "obsessed" with the father having A.C. She stated that "her focus on the father of the child appeared to impact her ability to fully grasp and comprehend what we were focused on in the parenting [session]." Petitioner made constant statements about the father, alternating between hating him and wanting to get back together to make a family. She regularly disparaged the father's girlfriend and strangely stated that

she thought the father and the girlfriend would get petitioner pregnant so they could keep that child as well. The provider constantly redirected petitioner, but she continued to focus on the father's relationship with his girlfriend rather than addressing the parenting and adult life skills materials. The provider also testified that once petitioner obtained a cell phone, she regularly sent threatening messages to the father. Further, petitioner misinterpreted another male DHHR provider's aid to her as romantic interest and messaged him to the point that he had to block contact with her.

The DHHR worker testified that petitioner had not been successful in her post-adjudicatory improvement period. She explained that petitioner had been to four different homeless shelters and left each because someone allegedly wronged her. Petitioner had also been hospitalized recently for homicidal thoughts towards the worker, the father, and his girlfriend, as well as suicidal ideations. Additionally, she stated that due to petitioner's mental health concerns she arranged for petitioner to undergo a second parental fitness and psychological evaluation, which ultimately found that she lacked parental capacity to care for A.C. The worker acknowledged that petitioner recently obtained an apartment, social security disability income, and had a change in medication, but opined that despite fifteen months of extensive services, petitioner had not gained the ability to safely parent the child.

Petitioner testified that within the last month she had been prescribed a new medication regiment that had dramatically helped her mood and anger issues. She stated that during the same time, her therapy sessions helped her see that the DHHR workers were there to help her and do what was in A.C.'s best interests. She also said she had an apartment and income and had enrolled in educational classes to obtain skills for the job market. She planned to attend college and obtain her driver's license. Petitioner also stated that she had had a change of heart and was willing to coparent with the father. She testified that she believed she had experienced a substantial change in circumstances that warranted another improvement period. On cross-examination, petitioner admitted to sending threatening messages to the father, threatening to blow up the hospital, threatening to stab the father and his girlfriend, and harboring homicidal ideations towards the DHHR worker. She further admitted to several hospitalizations due to psychotic episodes, the most recent of which occurred in February of 2021.

Finally, the father, G.D., testified that in March of 2020, petitioner came to his house and busted the rearview mirror on his girlfriend's vehicle. He pressed criminal charges against petitioner. Referring to A.C.'s surgery in February of 2020, he stated that petitioner's phone calls and threats interrupted his conversation with the surgeon several times. He testified that he was concerned with petitioner's long-history of hospitalizations and that she would be unable to keep A.C. in her care.

After hearing the evidence, the circuit court denied petitioner's motion for a post-dispositional improvement period, finding that petitioner had not proven a likelihood of fully participating in a third improvement period and that she had not shown a substantial change in circumstances. The court noted that Dr. Baker opined that petitioner still lacked the "parental capacity to care, protect, and change in order to provide adequately" for A.C. The court also noted that Dr. Baker testified that petitioner's personality characteristics and severe personality disorder inhibit her ability properly parent A.C., that petitioner's complicated mental health condition is extremely difficult to treat, and that petitioner would need longer than six months of mental health

treatment. The circuit court stressed its concerns with petitioner's violent threats towards multiple people during the proceedings, including her threat to a nurse that she would blow up the hospital. The circuit court found that petitioner's obsessive focus on A.C.'s father and his girlfriend prevented her from making any progress in services, such as adult life skills and individualized parenting classes. Also, petitioner's housing had been unstable throughout the case and she only obtained an apartment a couple of weeks prior to the dispositional hearing. Petitioner had been hospitalized for suicidal and homicidal ideations at least three times during the course of her two improvement periods, the most recent of which was in February of 2021. The circuit court concluded that petitioner had not adequately addressed her severe mental health issues. Regarding A.C.'s best interests, the court noted her "tender years" and medical conditions that required multiple heart surgeries. The circuit court found that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future and that it was necessary for A.C.'s welfare to terminate petitioner's parental rights. The circuit court's April 22, 2021, dispositional order reflected this termination.[2] It is from this dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in denying her a post-dispositional improvement period. In support, petitioner states that she was hospitalized near the end of her post-adjudicatory improvement period, and while there, obtained the proper medications and doses to manage her mental illness and anger issues. Petitioner also obtained a new therapist. According to petitioner, this ability to address her mental state also led to her ability to obtain suitable housing, social security income, and participate in parenting courses. As such, petitioner argues that she experienced a change in circumstances and was likely to fully participate in another improvement period. Additionally, petitioner acknowledged her "own failures regarding her mental health and homelessness issues" that led to the filing of the petitions and ultimately the termination of her parental rights.

---

[2]The father, G.D., is nonabusing and the child remains in his care.

West Virginia Code § 49-4-610(3)(D) provides that a circuit court may grant a parent a post-dispositional improvement period after the expiration of a previous improvement period when the parent shows that she "experienced a substantial change in circumstances" and that due to the change in circumstances, she was likely to fully participate in another improvement period. It is well established that "West Virginia law allows the circuit court discretion in deciding whether to grant a parent an improvement period." *In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2015). Finally, the circuit court has discretion to deny an improvement period when no improvement is likely. *See In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002).

It is clear from the record that petitioner was not likely to fully participate in a post-dispositional improvement period based on her performance in her preadjudicatory and post-adjudicatory improvement periods. Although petitioner eventually admitted that she has mental health and homelessness issues, she never gave an adequate explanation for the presence of codeine in A.C.'s umbilical cord blood. Furthermore, petitioner's drug testing was so inconsistent that the court and Dr. Baker were unable to determine the extent of petitioner's substance abuse and whether treatment was necessary. Contrary to petitioner's arguments on appeal, the evidence demonstrates that petitioner has a severe mental health problem, as she has been to four different homeless shelters, has been hospitalized numerous times for homicidal and suicidal ideations, and not only made violent threats against multiple people but acted upon her anger when she damaged the father's girlfriend's vehicle. Additionally, due to these severe mental health concerns, petitioner underwent two parental fitness and psychological evaluations—both of which concluded that she lacked the parental capacity to care for A.C. Although a DHHR worker acknowledged at the dispositional hearing that petitioner recently obtained an apartment, social security disability income, and had a change in medication, she still opined that despite fifteen months of extensive services, petitioner had not gained the ability to safely parent the child, and we agree. "In making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child." Syl. Pt. 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014). When considering petitioner's history of multiple hospitalizations and violent outbursts throughout her improvement periods, in addition to her need for extensive and ongoing treatment well beyond six months, we find no error in the circuit court's denial of petitioner's motion for a post-dispositional improvement period.

Next, petitioner argues that the circuit court erred in terminating her parental rights. Petitioner contends that she should have been granted a less-restrictive alternative disposition[3] and that the child's permanency was not affected since she remained with the father. Petitioner correctly cites West Virginia Code § 49-4-604(c)(6), which provides that a circuit court may terminate a parent's parental rights upon finding that "there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that

---

[3]In her brief, petitioner refers to "Alternative 5 Disposition." However, this disposition does not apply here as the child had been returned to the full custody of a parent. *See* W. Va. Code § 49-4-604(c)(5) ("Upon a finding that the abusing parent . . . [is] presently unwilling or unable to provide adequately for the child's needs, commit the child temporarily to the care, custody, and control of the department, a licensed private child welfare agency, or a suitable person who may be appointed guardian by the court.")

termination of parental rights is necessary for the welfare of the child. According to petitioner, there was a reasonable likelihood that she could correct the conditions of abuse and neglect because she recently obtained suitable housing, stable income, and proper medication and therapy.

However, the record shows that petitioner "demonstrated an inadequate capacity to solve the problems of abuse or neglect on [her] own or with help." W. Va. Code § 49-4-604(d). The DHHR offered petitioner parenting and adult life skills classes, yet according to the DHHR provider, petitioner's obsessive focus on the father and his girlfriend prevented her from fully grasping and comprehending the materials. Petitioner also demonstrated an inability to focus on caring for A.C. during supervised visitations, as she talked about the father rather than focus on spending time with the child. At the dispositional hearing, petitioner admitted to making threats towards others and threatening to blow up the hospital, yet minimized the threats. Even assuming petitioner's assertions regarding stable housing and income are true, the record does not support the assertion that petitioner's mental health and anger problems have been addressed. The circuit court noted petitioner's hospitalization as recently as February of 2021. The record supports the circuit court's finding that petitioner's severe mental health and anger issues remained untreated after nearly fifteen months of services from the DHHR. Thus, the circuit court did not err in concluding that there was no reasonable likelihood that petitioner could correct the conditions of neglect or abuse in the near future.

Regarding petitioner's argument that her parental rights to A.C. should have remained intact since the child was reunified with the father, we have previously held that "simply because one parent has been found to be a fit and proper caretaker for [the] child does not automatically entitle the child's other parent to retain his/her parental rights if his/her conduct has endangered the child and such conditions of abuse and/or neglect are not expected to improve." *In re Emily*, 208 W. Va. 325, 344, 540 S.E.2d 542, 561 (2000). When considering the above evidence, it is clear that the child would be endangered if returned to petitioner's care given her ongoing mental health and anger issues.

Insomuch as petitioner argues that the circuit court should have allowed her more time to demonstrate that she could correct the conditions of abuse and neglect, we have previously noted that

> "courts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements." Syl. Pt. 1, in part, *In re R.J.M.,* 164 W.Va. 496, 266 S.E.2d 114 (1980).

*Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, Syl. Pt. 4. Here, A.C. is nearly two years old and the circuit court noted her "tender years" when imposing disposition.

Finally, petitioner was not entitled to a less-restrictive alternative disposition. We have held that

"[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). As such, we find no error in the termination of petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its April 22, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: November 8, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton