# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

*In re* **A.P.**

**No. 25-798** (Cabell County CC-06-2023-JA-37)

## MEMORANDUM DECISION

Petitioner Mother M.S.[1] appeals the Circuit Court of Cabell County's October 27, 2025, order terminating her parental rights to A.P., arguing that the court erred in terminating her parental rights upon inappropriate evidence and without considering less restrictive dispositional alternatives.[2] Upon our review, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

The proceedings below were initiated when the DHS filed a petition in April 2023 alleging that the parents abused and neglected the child. In addition to allegations of extreme domestic violence necessitating law enforcement intervention, the DHS alleged that the petitioner was behaving erratically, as she informed a Child Protective Services ("CPS") worker that she "was fearful to stay at her home due to having her identity stolen." According to the DHS, the petitioner was sleeping in a truck "next to the federal building" because of this fear, although the petitioner "explained that they are home during the day, as she has not heard of crimes happening in Huntington during the day." The petitioner also expressed concern that a close friend had disappeared, that she believed the friend was deceased, and that "this was all tied in with everything somehow." Finally, the petitioner expressed concern that her phone had been "cloned" multiple times and "produced her old sim cards wrapped in foil" from her wallet. The petitioner indicated that she contacted the police and Federal Bureau of Investigation about this issue, and claimed that when she tried to call 9-1-1, "her phone redirects to someone who sounds like they are from Wayne County." According to the DHS, the petitioner was involved with CPS as a result of similar concerning behavior the year prior. Finally, the DHS alleged that the petitioner's mother-in-law had witnessed the petitioner's erratic behavior "for a couple of months." A CPS worker asked the petitioner if she would submit to an assessment at River Park Hospital, to which the petitioner agreed. However, the petitioner then repeatedly sent the CPS worker increasingly paranoid text

---

[1] The petitioner is self-represented. The West Virginia Department of Human Services ("DHS") appears by counsel Attorney General John B. McCuskey and Assistant Attorney General James Wegman. Counsel Kimberly E. McGann appears as the child's guardian ad litem ("guardian"). Respondent foster parents and intervenors below appear by counsel Jacquelyn Stout Biddle.

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

messages until the time for the assessment passed and the petitioner did not appear. The CPS worker then went to the petitioner's home, where she was "erratic, unable to focus," and remained fixated on "people scamming her, cloning her phone, rerouting her calls, stealing her identity, performing crimes in her name . . ., trying to kill her, etc." The petitioner then refused to submit for a voluntary mental health assessment. Accordingly, CPS obtained a mental hygiene order for the petitioner, but the order was not executed by law enforcement due, initially, to staffing issues. Eventually, the DHS removed the child from the home due to the petitioner's ongoing mental health issues.

It appears from the record that the petitioner was subsequently adjudicated based, in part, upon her mental health issues pursuant to her stipulation. However, the petitioner failed to include either the transcript of the adjudicatory hearing or the adjudicatory order in the appendix record on appeal. Further, the parties agree that the circuit court granted the petitioner an improvement period, although, again, the petitioner has failed to include any materials in the appendix record relevant to the improvement period.

In October 2023, the petitioner underwent a parental fitness evaluation with Saar Psychological Group. According to the psychologist's report, the petitioner was evaluated at Prestera Health Services on April 28, 2023, at which time she was diagnosed with brief psychotic disorder and bipolar disorder. During the Saar evaluation, the petitioner explained that she did not know exactly why the abuse and neglect cases was initiated but expressed that she had "theories" about the cause, including that her mother-in-law "wanted to 'ruin' her life." As detailed in the psychologist's report, the petitioner displayed "significant delusional beliefs" with "a paranoid and/or persecutory theme" during the examination, as she extensively described alleged efforts by the father and her mother-in-law to undermine her and focused on claims that her identity had been stolen and her electronics were tampered with. The petitioner "conceded that she had mental health issues 'for a while,'" though she explained that her only abusive or neglectful conduct was that she "had too much of a big head" and "had the wrong mindset." In fact, the petitioner denied that removal of the child was necessary in response to any of her conduct, instead claiming the removal was "due to what [the father] was doing." In regard to mental health treatment, the petitioner admitted that she had been prescribed lithium but opted not to take it because she did not feel she needed it. She also admitted that she was not truthful about her symptoms when evaluated by Prestera, explaining, "I wasn't revealing all my cards when I met with my psychiatrist, so they wouldn't think I was schizo. I've been evaluated five times." Despite this, the petitioner confirmed that she was diagnosed with bipolar disorder by Prestera in April 2023, although she claimed that the diagnosis was because she "talked fast."

The psychologist concluded that the petitioner displayed signs of "Unspecified Schizophrenia Spectrum and Other Psychotic Disorder." As to the petitioner's ability to parent, the psychologist was primarily concerned with her mental health issues and admission to "concealing the nature of her symptoms from her treatment professionals." The psychologist further noted that "[d]elusions . . . do not always respond to medication and can be significantly difficult to address as the individual may conceal them when they seek to minimize the negative impact of what they believe." The psychologist found that the petitioner "lack[ed] insight into the depth of [her] mental illness" and posed a "significant risk" to the child because she would likely act on her beliefs "with erratic and unexpected behaviors." While Prestera diagnosed the issue as

2

brief psychiatric disorder, the psychologist believed that the petitioner "continue[d] to experience persecutory delusions to the present and in spite of treatment." The psychologist thus concluded that the petitioner suffered from "a life-long condition that requires constant monitoring." Ultimately, the psychologist found the petitioner's prognosis for improved parenting to be extremely poor, "[g]iven the high level of risk associated with delusional belief systems, her non-compliance with treatment and her symptoms that persist despite the treatment she is currently receiving." The psychologist stressed that any treatment should be based on "this report as a guide" because the petitioner's self-reporting could not be relied on and cautioned that that the petitioner "will be highly motivated to try and conceal her beliefs from CPS and the Court." Finally, without "forensic confirmation that her persecutory delusional beliefs have been eradicated," the psychologist recommended that the petitioner have only supervised access to the child.

The matter proceeded for the next two years, although it is unclear what transpired during that period because of the petitioner's failure to include any relevant court documents in the appendix record. The circuit court held the final dispositional hearing in October 2025. The petitioner testified that she had participated in services, including parenting education, visits with the child, and two parental fitness evaluations—one with Saar Psychological, which the DHS paid for, and a second evaluation that the petitioner paid for and which was not made part of the record on appeal. The petitioner testified that she had continuously participated in therapy medication management through Prestera and continued to meet with a provider once every three months. The petitioner indicated that she was prescribed Seroquel[3] for help sleeping and had recently been prescribed "ADHD medicine to help wake me up during the day." When asked about the diagnosis that required this medication, the petitioner stated that "[i]t's pretty confusing" before explaining that she believed the "Seroquel is more to help me sleep than anything else" because, based on her experience "work[ing] in behavioral health" that "people that are totally mentally ill usually take" an amount higher than she was prescribed. The petitioner clarified that, although she was taking her medication, she was not prescribed any medication for a bipolar diagnosis or any other mental health diagnosis. The petitioner further clarified that she did not believe she had any mental health issues and was, instead, "in an abusive relationship and . . . couldn't take it anymore," before having a "mental breakdown." The petitioner then stated that she "started going to college" and was employed. The petitioner testified to her compliance with the requirements of her improvement period, such as maintaining employment and housing and taking her medication as prescribed. Regarding her parental fitness evaluation, the petitioner claimed that Saar Psychological "railroaded" her. The petitioner described a recent visit with the child that ended early after the petitioner videoed the child and questioned her about water being thrown on her. The petitioner also made derogatory comments about the foster parents in front of the child.

The circuit court then heard testimony from a former CPS worker who handled the petitioner's case before ending her employment with CPS in July 2025. According to the worker, the petitioner was "in denial of her issues" as outlined in her parental fitness evaluation. As such, the worker "question[ed] if she was getting anything out of [services]." The DHS then introduced

---

[3] Seroquel is a brand name of quetiapine, which "is an antipsychotic medication that treats several kinds of mental health conditions including schizophrenia and bipolar disorder." *Quetiapine Tablets*, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/19288-quetiapine-tablets (last visited Mar. 30, 2026).

the petitioner's evaluation with Saar Psychological into evidence, without objection. The CPS worker explained that the diagnostic impressions from the evaluation influenced the development of the petitioner's case plan, which included participation in psychiatric treatment and the need to acknowledge the ramifications of her diagnosis and the importance of treatment. The worker described the petitioner's erratic behavior as ongoing during the proceedings, as the petitioner continued to believe that "a group of unknown people were . . . after her." At the time the CPS worker left her employment, she recommended termination of the petitioner's parental rights due to her "continued issues with her mental health and the follow-up parental fitness evaluation that had shown no significant progress for her symptoms." The worker clarified that the petitioner's erratic behavior persisted throughout her entire time on the case, as the petitioner continued to send her "barrage[s] of text messages revealing things that she felt like she had experienced." After hearing the petitioner's dispositional testimony, the worker believed that the petitioner still failed to acknowledge her mental health issues, as her testimony "reminded [the worker] a lot of early on in the case . . . before she kind of did more treatment" and that the petitioner believed that the case was a result of things that "happened to her and that it was nothing . . . that she needed to address with herself." The CPS worker testified that she did not believe the petitioner had made progress in addressing her issues, despite treatment. Based on the petitioner's continued inability to differentiate "what is really happening and what she believes to be happening," the worker believed that the petitioner could not ensure the child's safety, especially given that the child was only four years old and vulnerable. Finally, the court heard testimony from the petitioner's mother-in-law, who expressed her concerns over the petitioner caring for the child.

At the close of evidence, the DHS and the guardian both requested termination of the petitioner's parental rights. Both recognized that the petitioner had complied with services, but argued that her failure to acknowledge the extent of her mental health issues required termination. The guardian argued that the petitioner had "essentially been trying to utilize those services to refute the findings of the parental fitness evaluation and to refute the allegations of the [DHS] rather than using her behavioral health services to correct the circumstances of abuse and neglect." The guardian stressed that, despite services over the course of twenty-nine months, "we're still at two hours of supervised visitation per week, and even as recently as last month that visitation being cut short based upon [the petitioner's] inappropriate communications with the child."

Ultimately, the circuit court found that the case required resolution because it had been "lingering for a long time." The court found that the petitioner had demonstrated a lack of cooperation with consistently taking her prescribed medication and that this would endanger the child's wellbeing. The court also stressed that the petitioner expressly disagreed with the diagnosis and findings of her parental fitness evaluation and explained that although she takes medication, it is not for any mental health issue. Further, the court found that the petitioner testified that domestic violence with the father was the only issue that she needed treatment for and that the issue was corrected when the parents separated. Based upon her "refusal to acknowledge her behavioral health needs as identified by the parental fitness providers that she had psychotic features and delusions that are likely life-long and was unlikely to comply with treatment," the court concluded that there was no reasonable likelihood that the petitioner could correct the conditions of abuse and neglect. Further, the court found that it was appropriate to terminate her

parental rights "so the child can be placed elsewhere." Accordingly, the court terminated the petitioner's parental rights to the child.[4] The petitioner appeals from the dispositional order.

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). Before this Court, the petitioner raises several assignments of error challenging the termination of her parental rights.[5] Central to several of these assignments of error is the claim that the circuit court erred in relying on the results of the petitioner's Saar Psychological evaluation because it was "outdated and unreliable." According to the petitioner, the court relied on this "stale" evidence instead of focusing on evidence of the petitioner's participation in treatment, medication management, and improved functioning. The petitioner asks this Court to weigh the available evidence and substitute its judgment for that of the circuit court, which we refuse to do. *See State v. Guthrie*, 194 W. Va. 657, 669 n.9, 461 S.E.2d 163, 175 n.9 (1995) ("An appellate court may not . . . weigh evidence as that is the exclusive function and task of the trier of fact."). Further, we note that the only evidence to which the petitioner cites in support of her ongoing treatment and improved condition is her own uncorroborated testimony.[6] We similarly refuse to usurp the circuit court's role as the arbiter of credibility. *See Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). Critically, the circuit court's apparent disregard of the petitioner's uncorroborated testimony is in keeping with the petitioner's admittedly dishonest responses during her Prestera evaluation and the Saar Psychological evaluator's conclusion that the petitioner "will be highly motivated to try and conceal" evidence of her ongoing mental health issues from the parties and the court. The petitioner further argues that the circuit court erred in relying on testimony from the former CPS worker because the worker was involved only in the "early stages" of her case. We note, however, that this assertion is not supported by the record, as the worker's testimony established that she was employed by CPS throughout the vast majority of the petitioner's case, having left her employment only three months prior to the final dispositional

---

[4] The father's rights were also terminated. The permanency plan for the child is adoption in the current placement.

[5] Although the petitioner initially lists eight assignments of error in her appellate brief, she abandons several of them in her argument section. Accordingly, we will address only those assignments of error that are supported by argument. *See* W. Va. R. App. P. 10(c)(7) (requiring that a petitioner's brief contain "an argument clearly exhibiting the points of fact and law presented, the standard of review applicable, and citing the authorities relied on, under headings that correspond with the assignments of error").

[6] We note that although the appendix record contains certain documents that appear to be from the petitioner's health care providers, the petitioner fails to include citations that pinpoint when this information was presented to the lower court. This is in violation of Rule 10(c)(7) of the Rules of Appellate Procedure, which permits this Court to disregard arguments that are unsupported by appropriate citation to the record. As such, the petitioner cannot be entitled to relief upon these documents.

hearing. Critically, the petitioner's assertion that the former CPS worker's testimony was based on "early case behavior and impressions" is without merit, as the worker listened to the petitioner's testimony at disposition and provided her opinions as to her ongoing mental health issues. Simply put, the petitioner's arguments on these issues are unavailing.

Next, the petitioner argues that it was error to deem her noncompliant "for refusing to confess to nonexistent symptoms." This argument, however, is simply another attempt by the petitioner to call into question the weight that the circuit court afforded the results of the petitioner's psychological evaluation. We again decline to reweigh this evidence and note that the petitioner's continued rejection of the conclusions from her parental fitness evaluation only underscores her ongoing failure to acknowledge her mental health issues. As the guardian argued below, the petitioner remains fixated on refuting these findings to the detriment of her ability to correct them. Indeed, as the petitioner points out on appeal, she testified extensively at disposition that she "does not believe she has a mental health diagnosis." As we have explained, "[f]ailure to acknowledge the existence of the problem . . . results in making the problem untreatable." *In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (quoting *In re Charity H.*, 215 W. Va. 208, 217, 599 S.E.2d 631, 640 (2004)). In further support, the petitioner again stresses her participation in supportive services. However, we have explained that "[i]n making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child." Syl. Pt. 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014). Here, the circuit court found that termination served the child's best interests because of the petitioner's history of noncompliance with medication management and the threat this posed to the child. Therefore, the petitioner is entitled to no relief in this regard.

Finally, the petitioner argues that the circuit court failed to consider less restrictive dispositional alternatives. However, the petitioner ignores the fact that the court expressly found that there was no reasonable likelihood that she could substantially correct the conditions based, primarily, on her failure to acknowledge her issues. As we have explained,

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Because the evidence, including the petitioner's continued denial of any mental health issues at disposition, supported the court's finding that there was no reasonable likelihood that she could correct the conditions of abuse and neglect, we conclude that it was not error to terminate the petitioner's parental rights.[7]

---

[7] The petitioner further alleges that because her fundamental liberty interests are implicated in the termination of her parental rights the circuit court also violated her due process rights. In further support of this due process argument, the petitioner asserts that "[a] parent cannot

6

For the foregoing reasons, we find no error in the decision of the circuit court, and its October 27, 2025, order is hereby affirmed.

Affirmed.

**ISSUED**: May 6, 2026

**CONCURRED IN BY**:

Chief Justice C. Haley Bunn
Justice William R. Wooton
Justice Charles S. Trump IV
Justice Thomas H. Ewing
Justice Gerald M. Titus III

---

meaningfully exercise the right to contest evidence if doing so is itself deemed proof of unfitness." However, having found no error in the termination of the petitioner's parental rights, we similarly conclude that her due process rights were not violated.